# Wytheville

## CITY OF RICHMOND V. MRS. BERTRAND T. JAMES.

June 8, 1938.

Present, Holt, Hudgins, Gregory, Browning, Eggleston
and Spratley, JJ.

The opinion states the case.

*James E. Cannon,* for the plaintiff in error.

*B. Harrison Turnbull, John G. May, Jr.,* and *V. P. Randolph, Jr.,* for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

Mrs. Bertrand T. James filed against the City of Richmond a notice of motion for judgment, in which she sought to recover damages for injuries alleged to have been caused

by her inhaling the fumes of illuminating gas, which she claimed had been allowed to escape into her residence through the negligence of the city. There was a jury trial which resulted in a verdict in her favor. Upon this verdict the trial court entered the judgment which is here for review. The parties will be referred to as they appeared before the court below.

For some time the defendant has been engaged in the manufacture, sale, and distribution of gas for cooking, heating, and lighting purposes in the city of Richmond. Several years prior to July, 1935, it supplied gas to the plaintiff at her residence, 2318 Grove avenue, in said city. The city had run a service pipe from its main on Grove avenue into the plaintiff's basement where it had installed a meter. At the main in the adjacent sidewalk there was placed a stop-cock for turning the gas on and off.

The evidence shows that usually another stop-cock is installed inside the building where the service pipe enters the meter. Here the gas may be cut off for the purpose of installing stoves and other fixtures in the house. All of the piping leading from the gas main up to the meter (including the nearby intervening stop-cock) is installed and owned by the city. All of the piping and fixtures in the building, beyond the meter, are installed and owned by the customer.

Whether the city had originally installed an inside stop-cock near the meter in the plaintiff's residence is a matter of dispute, as we shall hereafter see.

On July 22, 1935, the plaintiff, who had for some time before been conscious of the odor of escaping gas in her home, complained of this to the city. On the next day Gary, an employee of the defendant, came out to the plaintiff's residence and inspected the piping to determine whether it was leaking. The inspection showed a small leak in the gas range (which had not been installed by the city and was not under its control, as aforesaid), but none in any of the other piping. This leak was promptly corrected and is not of further concern to us.

The plaintiff continued her complaints of the odor of escaping gas until on October 9, 1935, upon her request, Kern, an employee of the city, came to the residence, disconnected the gas line and removed the meter. In doing so he left the end of the pipe open and uncapped. But he insists that he shut off the gas completely at the stop-cock near where the meter had been located in the basement, and that he tested the line and found no gas escaping. He says he did not turn off the valve at the sidewalk.

Five days later, on October 14, Ford, another city employee, came to the plaintiff's house pursuant to her further complaint of escaping gas. He testified that he found no leak, and that the gas had been cut off at the valve in the basement.

Mrs. James continued to detect the odor of escaping gas and finally, on either December 18th or 23rd (the evidence is not clear as to which date it was), she was made violently ill by the fumes. She then called her own plumber, Hazelwood, for an inspection of the pipes and fixtures.

Hazelwood testified that he noticed the odor of illuminating gas in the basement, and upon examination found that it was escaping from the end of the uncapped pipe to such an extent that he was able to light it with a match and it continued to burn. He testified positively that there was no valve for shutting off the gas in the pipe in the basement, from which the meter had been removed. For this reason he suggested to Mrs. James that the end of the pipe should be capped by him. But she said that she preferred to have the city do this. Thereupon she immediately telephoned the Gas Department which promptly sent out its employee, Friedhoff. Upon his arrival at Mrs. James' house, Friedhoff found that the gas was leaking from the end of the pipe, and that it was still burning where it had been ignited by Hazelwood. He says that he cut off the gas at the sidewalk, removed the section of the pipe containing the inside valve, and placed a cap on the end of the pipe. He filed with the department a written report showing that the leak

had been discovered and corrected in the manner just described.

Friedhoff testified that his visit to the house was on December 18th, while Mrs. James put the time as December 23rd, stating that Friedhoff had told her that the latter was the date of his visit.

At any rate, even after the trouble had apparently been located and remedied, Mrs. James continued to complain of escaping gas. To complaints made by her on December 31, 1935, January 9, May 7 and 8, 1936, respectively, the defendant sent inspectors who were unable to locate any escaping gas, or even to detect any odor thereof.

Mrs. James left her residence late in December, 1935, and after spending two weeks in a hospital in January, went to a hotel where she stayed until the following May.

The testimony of Mrs. James as to the existence of illuminating gas odors in her residence is corroborated by that of her sister, who testified that she was in the residence from July to December 15, 1935, and that she left on the latter date because she found that her health was being affected by the gas fumes.

The principal assignment of error is that the evidence is not sufficient to sustain the jury's finding that the city was guilty of actionable negligence.

We think the evidence adduced on behalf of the plaintiff justified the jury in finding that when the meter was removed from the plaintiff's residence on October 9, 1935, the gas was not cut off either at the valve in the sidewalk, or at the valve near the meter; that the end of the pipe was left open and uncapped; and that gas escaped into the house through this open pipe until it was capped by an employee of the city on the day on which Mrs. James was taken violently ill, either on December 18th, or on December 23rd.

Indeed, the positive testimony of Hazelwood is that there was no cut-off valve near the end of the pipe, from which the meter had been removed, when he discovered the leak. While several employees of the city testified that this

valve was on the pipe, the verdict of the jury has settled that conflict in favor of the plaintiff.

But, in any event, we think the jury was warranted in accepting the testimony of Hazelwood, a plumber of long experience, that when the meter was removed the end of the pipe should have been closed and capped. Obviously, if this had been done in the proper manner it would have prevented the escape of the gas, regardless of whether or not the valves had been closed.

Since one of its employees had removed the meter and left the pipe open and in an unsafe condition, the city had actual knowledge of the situation and should have known that gas would escape.

In *Alexandria Mining, etc., Co.* v. *Irish,* 16 Ind. App. 534, 44 N. E. 680, it was held that, where a gas company had knowledge of the imperfect condition of its pipes, it was not necessary to show that on a particular occasion it knew that gas was escaping therefrom, since from the condition of the pipes the company was bound to know that gas would escape. See also, *Dow* v. *Winnipesaukee Gas, etc., Co.,* 69 N. H. 312, 41 A. 288, 42 L. R. A. 569, 76 Am. St. Rep. 173; 12 R. C. L., p. 908, sec. 48.

Having knowledge that the pipe was open and uncapped, the city was guilty of continuing negligence in thereafter permitting its gas to flow through this pipe.

In *Southern Indiana Gas Co.* v. *Tyner,* 49 Ind. App. 475, 97 N. E. 580, it was said (page 585): "And if such gas company, after obtaining information that the pipes in a building through which it furnishes gas are leaking, by its agent, undertakes to find and repair such leaks, and fails to repair the same, or negligently repairs the same, and then continues to furnish its gas through such defective pipes, and injury results to a person who is himself without fault, such company is liable. The negligence in such cases consists, not in the failure to inspect the pipes of the owner of the building, but rather in the furnishing of the gas through the pipes after obtaining the knowledge or information that

would suggest to a person of ordinary care and prudence the danger of allowing the gas to pass through such pipes."

In *Lynchburg Gas Co.* v. *Sale*, 160 Va. 783, 169 S. E. 577, this court sustained a verdict and judgment in which a gas company was held liable for turning its gas into a pipe without taking the necessary precautions to ascertain that the end of the pipe was uncapped and open, and that gas would necessarily escape therefrom. See also, *Schmeer* v. *Gas Light Co.*, 147 N. Y. 529, 42 N. E. 202, 30 L. R. A. 653.

At the request of the city the court granted, without objection on the part of the plaintiff, instruction B, which reads as follows:

"The court instructs the jury that if you believe from the evidence that when the gas meter was removed on October 9, 1935, defendant's employee properly shut off the gas at the valve near to the location of the meter, and by proper test found that no gas was leaking from the pipe, and that said valve was of standard design and in good condition, and thereafter when notified or requested by the plaintiff so to do the defendant made reasonable and proper inspection of said gas pipe and valve, then the defendant discharged its full duty towards the plaintiff, and you must find for the defendant even though you may believe from the evidence that the defendant did not shut off the gas at the street valve and did not cap the service pipe in plaintiff's basement."

The city argues that, since there was no objection to this instruction it became the law of the case, and the jury should have found a verdict in its favor thereunder.

The fallacy of this argument is that it assumes that there was an inside valve near the meter, and that the gas had been properly shut off there.

In the first place, as we have seen, Hazelwood testified positively that this usual inside valve was missing, as the result of which gas was escaping from the uncapped pipe.

Although this testimony of Hazelwood is contradicted by that of several of the city's employees, we can not say that the jury should have rejected it as unworthy of belief.

But even if we assume that the valve was in place and was in good condition, yet the uncontradicted evidence is that gas was, in fact, escaping from the pipe to such an extent and under such pressure that it ignited when Hazelwood applied a match thereto, and was still burning when Friedhoff, the city inspector, arrived. Mrs. James and her sister testified that the odor of gas was worse after the meter was removed. There is not the slightest suggestion that anyone tampered with the valve after the city's employee is supposed to have shut it off the day the meter was taken out. Therefore, the jury was not bound to find that the "defendant's employee properly shut off the gas at the valve" when the meter was removed. Indeed, it was justified, we think, in finding the contrary.

We are of the opinion that there was ample evidence to justify the jury in finding that the defendant was guilty of actionable negligence.

Next, it is said that the plaintiff was guilty of contributory negligence in remaining in her home after she detected the odor of escaping gas there.

The evidence shows that in response to Mrs. James' numerous complaints the employees of the city visited the premises from time to time, and after inspecting the piping insisted on each occasion, prior to the date the leak was discovered by Hazelwood, in December, that no gas was in fact escaping from the city's pipe. Under these circumstances it hardly lies in the mouth of the city to say that she was guilty of contributory negligence, as a matter of law, for not abandoning her home. At most it was a question for the jury as to whether she should have done so.

Again, the city insists that Mrs. James was guilty of contributory negligence in having her house caulked and weather-stripped. It is said that the effect of this was to retain in the house the objectionable fumes, and to exclude the necessary fresh air.

The evidence is that after the various inspectors of the city reported to Mrs. James that no gas was escaping in her home, she consulted others, who advised her that pos-

sibly the fumes of which she complained came from the outside, and to meet this theory she had the caulking and weather-stripping done.

There is not the slightest evidence that if the caulking and weather-stripping had not been installed, Mrs. James' injuries would have been avoided or in any way lessened. We can not say, then, that such installation was contributory negligence on her part.

There is clear and convincing medical testimony from the physicians who attended Mrs. James in December, 1935, and in the following January and February, that she was suffering from chronic monoxide poisoning which necessitated hospital treatment over a period of two weeks. The testimony is that such monoxide poisoning sometimes results from coal or oil furnaces, as well as from illuminating gas.

The city earnestly contends that the evidence was not sufficient to support the jury's finding that her injuries were caused by the fumes of illuminating gas, and that it is just as probable under the evidence that she was affected by fumes from the oil burner in her basement, or by other gases generating in some unexplained manner.

It is true that Mrs. James at first thought that the fumes of which she was complaining came from her furnace in the basement. In April, 1933, she installed a furnace for burning coal. Since the disagreeable fumes continued, she changed the furnace to an oil burner in the fall of 1933. She complained of odors from this furnace and it was removed and another oil burner installed in December, 1934. The latter seemed to have been satisfactory and she made no further complaint of odors or fumes from that source.

The medical testimony is that carbon monoxide generated by a coal or oil furnace is odorless, while it is a matter of common knowledge, supported by the evidence before us, that illuminating gas has a strong and quite distinctive odor.

Mrs. James testified that the fumes from the furnace of which she had complained were eliminated in the spring of 1935. She likewise testified that the fumes of which she

complained to the city, in the fall of 1935, "smelled like gas." Her sister, Mrs. May, who was compelled to leave the residence on December 15, 1935, because she was made ill by the escaping fumes, testified that they had "the smell of illuminating gas," and that these odors were perceptible in her bedroom.

Hazelwood testified that on the day he discovered the leak from the open pipe there was an unmistakable odor of illuminating gas in the basement. This was the same day Mrs. James was made seriously ill. There is no evidence of any obnoxious fumes in the house from any other source on or about that day.

The physicans who treated Mrs. James testified that while they were unable to say what was the cause of her monoxide poisoning, her condition was consistent with poisoning from illuminating gas.

While the matter is not entirely free from doubt, yet we think the evidence was sufficient to justify the jury in finding that Mrs. James' injuries were due to illuminating gas which had escaped from the defendant's pipe. The jury had before it all of the circumstances which the learned counsel for the city has so forcefully argued,—the fact that Mrs. James complained of fumes from other sources, the fact that she continued to complain of gas fumes even after the leak had been discovered and repaired, and the further fact that her injuries appear to be out of proportion to the small quantity of gas which escaped into her house. It weighed all of these circumstances and concluded that the plaintiff was entitled to a verdict. The trial court who saw and heard the witnesses has approved this finding. We can not say that the judgment is plainly wrong or without evidence to support it. Therefore, it is our duty to affirm it. Code, section 6363.

Argument is made that the judgment of the lower court should be reversed because there is a variance between the allegation and the proof as to the date on which the injury occurred. It is said that the plaintiff alleges that she was overcome by gas on December 23rd, while the evidence

shows that the leak in the pipe was discovered and repaired on December 18th.

In the first place, the plaintiff does not allege in her notice of motion for judgment that she was overcome by gas on December 23rd. The allegation is that the leak was discovered on that date. This is followed by a general allegation that, as a proximate result of the gas leaking into her house, she was injured. But the specific date of the injury is not alleged.

Moreover, while Friedhoff testified that the pipe was capped on December 18th, Mrs. James fixed the date as December 23rd.

But aside from these matters, the evidence is clear that the plaintiff was overcome on the date on which the pipe was capped, and not five days later as the city suggests. Since both of the dates in question are within the sixty-day statutory period required for notice to the city, it is quite immaterial whether the plaintiff's injuries occurred on the one rather than on the other.

Finally, the city contends that no notice was given to it of the plaintiff's injuries within sixty days after the accrual of her cause of action, as required by section 19-g of the City Charter. (Acts 1926, ch. 318, at p. 552.)

Here the argument is that, if the city was guilty of any negligence it occurred on October 9, 1935, when the meter was removed and the pipe left uncapped, whereas the notice of the plaintiff's injuries was not served until February 4, 1936.

The negligence of the city was more than the act of leaving the pipe uncapped on October 9th. It likewise consisted in the continuing act of furnishing gas through the pipe which its own employee had left in an unsafe condition, and of which it had knowledge. *Lynchburg Gas Co.* v. *Sale, supra; Southern Indiana Gas Co.* v. *Tyner, supra.* Without the continuing flow of gas through the pipe there would not have been any injury to the plaintiff, even though the pipe had been left uncapped.

It is true that ordinarily the statute of limitations begins to run at the time of the commission of the wrongful or negligent act, and not from the time of the damage or discovery of the injury. 17 R. C. L., p. 764, sec. 129.

But as it is said in 37 Corpus Juris, p. 897, sec. 259: " * * * where injury results from a negligent act and the injury continues by reason of continued negligence, a recovery may be had for damages caused by the continuing negligence, although a cause of action based on the original negligent act is barred." See also, 17 R. C. L., p. 764, sec. 129.

Consequently, it is said in 43 Corpus Juris, p. 1208, sec. 1975: "Where the damages are continuing and the statute requires notice or presentation of claim within a specified time after the claim accrues, recovery can not be had for damages accruing more than the specified time prior to such notice or presentation. But failure to give notice of damages by flooding, due to the faulty construction of a culvert, does not preclude recovery of damages from subsequent flooding, of which timely notice was given."

Among the authorities cited in support of this proposition is *Wright* v. *City of Richmond,* 146 Va. 835, 132 S. E. 707. In that case the city of Richmond negligently caused the plaintiff's land to be flooded by obstructing a natural water course and erecting an insufficient culvert. There was an overflow of the plaintiff's land on August 26, 1922, of which no notice was given. There was a subsequent overflow on July 30, 1923, of which the city was properly notified. The city contended that the plaintiff's cause of action arose on August 26, 1922, and being permanent in character must date from the first damage resulting from the faulty construction of the drain. In disposing of this contention this court said (146 Va. at page 841, 132 S. E. at page 709):

"If the plaintiff is willing to overlook the damages he suffered by the first flooding of his land, or such as may be caused by any subsequent overflows, it is his privilege to do so, and his failure to give the proper notice to the city

of his intention to demand compensation for the damages sustained, operates as a waiver as to that particular item of damage, but does not affect his right to redress for subsequent wrongs, of which he alleges the city was continually being notified after the insufficiency of the drainage had been demonstrated."

To the same effect, see *Meruk* v. *New York,* 223 N. Y. 271, 119 N. E. 571; *Smith* v. *City of Winston-Salem,* 189 N. C. 178, 126 S. E. 514; *Armstrong* v. *City of Seattle,* 180 Wash. 39, 38 P. (2d) 377, 97 A. L. R. 826.

The record discloses that the trial court properly limited the plaintiff's recoverable damages to compensation for such injuries as she had received within sixty days of the date of her notice to the city. See *Armstrong* v. *City of Seattle, supra; Beard* v. *Kansas City,* 96 Kan. 102, 150 P. 540.

On the whole we find no error in the judgment complained of. Accordingly it is

*Affirmed.*