**William P. MOORE, Plaintiff,**

v.

**ALLIED CHEMICAL CORPORATION, the Travelers Indemnity Company, and Hooker Chemicals & Plastic Corp., Defendants.**

Civ. A. No. 77–0379–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 17, 1979.

Edward W. Taylor, Robert M. Johnson, John H. Herbig, Harris, Tuck & Freasier, Richmond, Va., for plaintiff.

Joseph M. Spivey III, Hunton & Williams, Richmond, Va., Harry E. McCoy, Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., W. Carter Younger, McGuire, Woods & Battle, Richmond, Va., for defendants.

## MEMORANDUM OPINION

CLARKE, District Judge.

Plaintiff, a citizen of Virginia, brought this action against three defendants: Allied Chemical Company (hereinafter "Allied"), a New York corporation with its principal place of business in New Jersey; The Travelers Indemnity Company (hereinafter "Travelers"), a corporation organized in a state other than Virginia, with its principal place of business in the State of Connecticut; and Hooker Chemicals & Plastic Corp. (hereinafter "Hooker"), a New York corporation with its principal place of business in New York. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332(a). The case comes before the Court on motions for summary judgment by all three defendants.

### Factual Background

The basic history of this controversy is not in dispute. In the late 1940's, a chemist for Allied invented a compound commonly known as Kepone, or DMCP.[1] Allied and others subsequently used Kepone in the manufacture of various insecticides and pesticides. Hooker was a patent owner and producer of a chemical substance known as Hexachlorocyclopentadiene (HCP), the essential toxic raw material for DMCP.

Virtually all Kepone produced in the United States was exported, because the Food and Drug Administration prohibited its use on food crops in the United States in the early 1960's. For several years several independent companies produced most of the Kepone requirements for Allied. However, in 1966 Allied decided to produce Kepone in its "Semi-Works" facility at Hopewell, Virginia. Production commenced in that year and continued until 1974.

For reasons which are in dispute, Allied eventually decided to terminate its produc-

---

1. Kepone is chemically known as decachloro-octahydro-1, 3, 4,—metheno-2H-cyclobuta(cd)pentalen-2-one (DMCP). Officially, Kep-one is known as chlordecone with the empirical formula $C_{10}Cl_{10}O$.

tion of Kepone and "go outside" for its Kepone requirements. On November 30, 1973, Allied executed an agreement with Life Science Products Company (hereinafter LSP) for the production of Kepone. Under the agreement, Allied agreed to provide LSP with all the necessary raw materials, including HCP, which LSP would process and convert into Kepone. Allied agreed to receive the finished product in drums supplied by Allied at LSP's plant and to pay for certain quantities of the Kepone as produced. Title to all raw materials and to the Kepone produced by LSP remained at all times in Allied Chemical.

The two principals and sole stockholders of LSP were plaintiff William P. Moore and Virgil Hundtofte. Prior to his retirement, Moore worked as an inorganic chemist for Allied for twenty-seven years. Hundtofte worked for Allied from 1965 to 1973; for three years, he was plant manager at Allied Hopewell plant.

LSP commenced operations in March 1974. Six months later, an employee of LSP complained to the Occupational Safety and Health Administration (OSHA) of excessive pesticide fumes and dust in the LSP plant. OSHA found insufficient evidence to support the charge, however, and dismissed it. In June 1975, several workers at the LSP plant became extremely ill. Investigations were conducted by OSHA and State Health Department officials. LSP ceased operations voluntarily no later than July 24, 1975. Numerous lawsuits and administrative proceedings against LSP, Moore, and Hundtofte ensued. Moore paid fines to OSHA and pleaded nolo contendere to several criminal charges in connection with the operation of the LSP plant.

Plaintiff Moore filed the complaint in this case on July 1, 1977. Seven counts are alleged. Count I alleges that Allied negligently, carelessly, and deliberately failed to warn plaintiff that DMCP was highly dangerous to exposed humans and aquatic life. Count II charges that on December 22 to 24, 1975, meetings were held between officials of Allied, Travelers and its underwriters, and Ruder & Finn (Allied's public rela-

tions firm). According to Moore, Allied and Travelers there and then did associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring him in his reputation, trade, and business, in violation of *Va.Code Ann.* § 18.2–499 (Repl.Vol.1975). In Count III, Moore alleges that Allied breached a warranty that DMCP was unlikely to cause contamination of the environment and humans. Count IV charges Allied with negligently misrepresenting and concealing from plaintiff the true facts concerning the dangers of Kepone. Count V accuses Allied of defamation in referring to plaintiff as the "world's expert" on Kepone and as the "real culprit" in the Kepone disaster. Count VI alleges that Allied and Hooker are strictly liable for their failure to warn him of possible dangers in the use of their products. Finally, Count VII alleges negligence against Travelers (which insured both Allied and LSP); that it negligently failed to warn plaintiff of the dangers of Kepone, made inspections, and rendered advice, thus lulling him into a "false sense of security."

Moore contends that he has suffered the following damages as a result of the alleged conduct of defendants: (1) loss of his reputation; (2) loss of trade, business, and profits; (3) pain, mental anguish, and suffering by reason of the sickness of his former employees and others; (4) subjection to civil lawsuits, prosecution by government agencies, and fines and penalties imposed; (5) attorney's fees; (6) injury to his credit and financial standing; (7) defamation of his character; (8) loss of earnings and diminution of his capacity to earn in the future; and (9) loss of investments.

Defendants argue that this suit is barred for a variety of reasons: the applicable statute of limitations; collateral estoppel; a previous accord, satisfaction, and release; lack of standing; lack of evidence to support the existence of a conspiracy; contributory negligence; and assumption of risk. Because all three defendants have raised the statute of limitations as a defense, the Court will examine that question first.

### Statute of Limitations

When jurisdiction rests on diversity of citizenship, the state statute of limitations must be applied. *Sides v. Richard Machine Works, Inc.*, 406 F.2d 445 (4th Cir. 1969). All parties agree that the applicable limitation provision here is *Va.Code Ann.* § 8–24 (Repl.Vol.1957), which provides in pertinent part:

Of actions not before specified.—Every action for personal injuries shall be brought within two years next after the right to bring the same shall have accrued. . Every personal action, for which no limitation is otherwise prescribed, shall be brought within five years next after the right to bring the same shall have accrued, if it be for a matter of such nature that in case a party die it can be brought by or against his representative; and, if it be for a matter not of such nature, shall be brought within one year next after the right to bring the same shall have accrued.

This action was filed on July 1, 1977. Defendants argue that the applicable period of limitations as to all seven counts of the complaint is one year, thereby barring the entire suit. Plaintiff, on the other hand, argues that the suit is not time-barred, because the applicable limitations period is either two years or five years. Due to the various arguments made by the parties, the Court will examine each count separately.

### A. *Count I*

According to Count I, Allied "negligently, carelessly, deliberately and with a conscious disregard of the rights of the plaintiff and others encouraged the plaintiff to increase and continue production of DMCP, despite its corporate knowledge that DMCP was highly dangerous to exposed humans and aquatic life."

Plaintiff agrees with Allied that this cause of action occurred no later than July 24, 1975, when LSP ceased operations. However, he argues that this count advances, in reality, two causes of action: intentional or reckless infliction of emotional distress, and a breach of duty to warn. The former theory (an action for personal injuries) is subject to a two-year limitations period; the latter, five years. Under either theory, he argues, this count is not time-barred.

### 1. *Infliction of Emotional Distress*

Virginia recognizes a cause of action for emotional distress, even when unaccompanied by physical injuries, when the following elements are shown:

One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

*Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974). Undoubtedly, an action for emotional distress is an action for personal injuries carrying a two-year limitations period. The question is whether Count I alleges such a cause of action.

The Court finds that, when liberally construed, Count I does state a cause of action for emotional distress. *Inter alia,* plaintiff alleges that Allied knew of the devastating physiological effects which DMCP and Kepone could have on workers but deliberately failed to warn him. As a result of this failure to warn, he contends, many workers became chronically ill and permanently disabled. Their illnesses allegedly caused him "considerable pain, anguish and suffering." If plaintiff can prove his allegations, reasonable men could conclude that Allied showed a reckless disregard for the rights of the officers and employees of LSP, and should have known that its failure to warn would cause injury

to workers and severe emotional distress to Moore. Similarly, a reasonable fact finder could find that the failure to warn of Kepone's effects was "outrageous and intolerable" and caused severe emotional distress to Moore.

Insofar as Count I states a cause of action for emotional distress, the two-year limitations period applies. Because plaintiff and Allied were in a continuing contractual relationship, and because the alleged failure to warn would be a continuing wrong, plaintiff may recover under this theory for any injuries suffered as a result of the alleged wrong on or after July 1, 1975. *See, e. g., Sides v. Richard Machine Works, Inc.*, 406 F.2d 445 (4th Cir. 1969); *Tyler v. Street*, 322 F.Supp. 541 (E.D.Va. 1971); *McCormick v. Romans*, 214 Va. 144, 198 S.E.2d 651 (1973); *City of Richmond v. James*, 170 Va. 553, 197 S.E. 416 (1938).

**2. Breach of Duty to Warn**

According to plaintiff, Count I also should be construed to allege that Allied negligently, carelessly, and deliberately failed to warn him of the dangers of Kepone which it knew, yet concealed. He admits that the two-year limitations period is not applicable to this allegation because it cannot be construed as an action for personal injuries within the meaning of *Va.Code Ann.* § 8–24. However, he contends that the five-year limitations period is applicable. Defendants, on the other hand, argue that the claim is governed by the one-year period and is therefore time-barred.

■ The Court finds that the complaint, when liberally construed, does allege that Allied breached a duty to warn plaintiff of the effects of Kepone. Therefore, the question is whether the period of limitations is one year or five years.

■ Whether or not one applies the one year or five year time period depends upon the "survivability" of the claim. Section 8–24 states that the proper period is five years if the action is one which would survive the death of either party; if not, the one-year period applies. Survival depends upon whether or not the action con-

cerns an injury to property or an injury to the person. Injuries which are personal in nature must be brought within one year after the cause of action accrues. The five-year period governs when there has been a direct injury to property or to a property right, not an indirect or consequential injury which results from direct injury to the person. To be direct, the damage must be the very first or initial damage done to the property. Furthermore, the property or property right must somehow be wasted, carried off, or damaged. *See, e. g., Holdford v. Leonard*, 355 F.Supp. 261 (W.D.Va. 1973); *Travelers Insurance Co. v. Turner*, 211 Va. 552, 178 S.E.2d 503 (1971); *Carva Food Corp. v. Dawley*, 202 Va. 543, 118 S.E.2d 664 (1961); *Cover v. Critcher*, 143 Va. 357, 130 S.E. 238 (1925); *Mumpower v. Bristol*, 94 Va. 737, 27 S.E. 581 (1897). In determining whether the action survives, the Court must regard the real nature of the injury, not the form or method by which it is sought to be redressed or enforced. *E. g., Carva Food Corp. v. Dawley, supra.*

■ The Court's first inquiry is whether any of the injuries claimed are injuries to property, as opposed to personal injuries, within the meaning of Section 8–24. Among the injuries claimed are: damage to reputation; pain, mental anguish, and suffering; injury to credit and financial standing; and defamation of character. Under Virginia law, these are clearly personal injuries. *E. g., Evans v. Sturgill*, 430 F.Supp. 1209, 1215 (W.D.Va.1977); *Worrie v. Boze*, 198 Va. 533, 95 S.E.2d 192, 195 (1957); *Watson v. Daniel*, 165 Va. 564, 183 S.E. 183, 184 (1936).

■ The remaining injuries claimed—loss of trade, business, and profits; subjection to litigation and governmental action, plus resulting fines and penalties; attorney's fees; loss of earnings and diminution of earning capacity; and loss of investments—theoretically, are injuries to property. The next question is whether Allied's conduct caused direct damage to this property. As described *supra*, if the injury is indirect, it is governed by the one-year limi-

tations period. Clearly, subjection to litigation and governmental action, and payment of attorney's fees, are indirect injuries. These were not the initial injuries resulting from defendants' alleged breach. According to the complaint, the failure to warn plaintiff of the dangers of Kepone caused him to commence production of Kepone; because of the production of Kepone, LSP workers were exposed to serious hazards and, consequently, seriously injured; and as a result of these injuries, plaintiff was subjected to private and governmental action, as a result of which he was forced to pay fines, penalties, and attorney's fees. Under the extremely technical analysis employed by the Virginia Supreme Court, these expenses were indirect and consequential damages resulting from the need to prevent deprivation of liberty and to minimize further financial damage or injury to reputation. *See, e. g., Evans v. Sturgill, supra.*

■ In certain cases, Virginia courts have held that the five-year period applies to the remaining injuries claimed by plaintiff—loss of earnings and earning capacity, loss of trade, business, and profits, and loss of investments. However, the alleged injury must be direct and the property or property right must in some way be carried off, wasted, or damaged. Loss of profits or earnings is considered direct damage to property only in very limited circumstances: for example, where an employee breaches a specific covenant not to compete, *Worrie v. Boze, supra*; or when an individual has an interest in property which is fraudulently sold for the purpose of depriving him of profits from that property, *Blackwelder v. Millman*, 522 F.2d 766 (4th Cir. 1975). Generally, the loss of earnings, earning capacity, or of profits is not considered direct damage to property, because it does not involve the destruction or asportation of existing property. *See, e. g., Evans v. Sturgill, supra; Vance v. Maytag Sales Corp.*, 159 Va. 373, 165 S.E. 393 (1932); *Mumpower v. Bristol*, 94 Va. 737, 27 S.E. 581 (1897). Therefore, it becomes necessary to determine how and whether any property of plaintiff has been affected by Allied's alleged conduct.

■ Plaintiff alleges that he has lost his trade, business, and investments as a result of Allied's failure to warn him of the dangers of Kepone. It may be that, but for the failure to warn, these dangers would not have occurred. The "but for" test, however, is not the test of survivability. Rather survivability depends upon whether the injury to property was direct. As Judge Dalton has stated:

[T]he Virginia Supreme Court in § 8–24 cases is looking for the very first instance of harm, no matter how small or minute. It appears that the demarcation line between a direct and an indirect injury is drawn immediately after any initial harm. The obscurity or minuteness of such harm is of no consequence, and everything occurring after it is an indirect injury.

*Holdford v. Leonard, supra*, at 264.

The damage to property (trade, business, and investments) here was unquestionably indirect under Virginia law. According to plaintiff, had he known that Kepone could produce such tragic and disastrous results as those which occurred here, he never would have agreed to produce Kepone. Thus, he first sustained injury when he entered into the contract with Allied and took steps to commence production of Kepone without knowledge of the risks involved. It makes no difference that the injury was slight, or that plaintiff was unaware of it. *See, e. g., Richmond Redevelopment & Housing Authority v. Laburnum Construction Corp.*, 195 Va. 827, 80 S.E.2d 574 (1954) (damage caused to house by explosion resulting from defective gas pipe was indirect; plaintiff suffered direct injury when the defective pipe was installed. The injuries which followed—the sickness of the workers; the shutdown of the plant; the civil suits, the governmental investigations, and the payment of fines, penalties, and attorney's fees; the shutdown of the plant; the loss of business, profits, and earning capacity—were indirect or consequential results of the initial injury.)

It is also apparent that plaintiff has sustained no property damage within the meaning of Section 8–24, as interpreted by the Supreme Court of Virginia. For the five-year statute of limitations to apply, the act of defendants must directly operate to take, carry away, waste, or damage the property of the plaintiff. *E. g., Mumpower v. Bristol, supra.* Plaintiff alleges that he has lost his investments in LSP and that the LSP plant has been closed and dismantled. But there is no evidence that Allied took, carried away, wasted, or destroyed his property. Rather, in charging Allied with breach of duty to warn, plaintiff seeks to hold Allied personally responsible for fraud directed at his person, not to recover for the damage to his property which was the consequential injury flowing from the fraud. It was not the property itself but the use of the property—the chance to make profits and recover his investment—which was affected by Allied's alleged conduct. Such a right of action is not survivable, and is governed by the one-year period. *E. g., Carva Food Corp. v. Dawley, supra; Cover v. Critcher, supra; Mumpower v. Bristol, supra.*

Plaintiff argues that the common thread running through those Virginia cases applying the one-year statute of limitations is that some wholly independent event or act intervenes with the original act, causing injury to property, without which there would have been no injury to the property involved. Here, he says, no intervening event occurred between the alleged failure to warn and the damage to his business. Thus, he concludes, the injury was direct.

The Court cannot agree with this analysis. There were intervening events here; after the alleged failure to warn, plaintiff commenced operation of the LSP plant and produced Kepone. Without his actions, the catastrophic results would never have occurred. This case is, therefore, quite similar to *Travelers Insurance Co. v. Turner*, 211 Va. 552, 178 S.E.2d 503 (1971). In that case, the assignee insurance company sued an insurance agent for his failure to effect insurance coverage as agreed between him and the assignor. Before the coverage had been effected at the time agreed, the assignor became involved in an accident, thus forcing the assignor to defend him and incur substantial expenses. The Supreme Court held that the one-year limitations period applied. The damage occurred because of an intervening event—the assignor's operation of the car. Thus, the action was of a personal nature and the five-year period was inapplicable. In the case at bar, the injuries to the employees and to plaintiff's business did not occur when Allied failed to warn him, but when he proceeded to operate his plant and manufacture Kepone.

Nonetheless, plaintiff appears to argue that, even if his operation of the plant was an intervening event, Allied's failure to warn would have prevented that intervening event, and the subsequent damage for he never would have entered into the contract with Allied had he known of Kepone's effects. For that reason, he opines, Allied inflicted direct injury. This theory was rejected in *MacKethan v. Peat, Marwick, Mitchell & Co.*, At Law No. 6899 (Cir.Ct. of the City of Richmond, Jan. 15, 1975). In *MacKethan*, a receiver of a savings and loan company sued an accounting firm for failure to report to the company's board of directors that, according to an audit, certain employees of the company were improperly diverting funds. The receiver argued that, while the employees actually caused the damage, they would have been prevented from doing the acts causing the damage if the defendant had disclosed the contents of the report in a timely manner to the company. However, the Circuit Court held that the one-year statute applied:

> [T]he direct causes of the loss and damages were the actions of Hall and other officers of the NS&L. No alleged acts of defendant *caused* the damage, but plaintiff's contention is that *if* defendant had done what it is claimed it should have done, Hall and associates would have been *prevented* from doing the acts which caused the damage.

*Id.* at 4.

The present case is on all fours with *MacKethan*. Plaintiff's basic theory is that,

had Allied properly warned him of the dangers of Kepone, either he would have taken steps to prevent injury to employees, or he never would have agreed to produce Kepone. The injuries to the employees, and the damages resulting therefrom, occurred because of the operation of the LSP plant by plaintiff and Hundtofte.

Plaintiff argues that *MacKethan* is distinguishable because that case involved totally independent intervening forces. The Court cannot agree. Plaintiff overlooks the fact that in *MacKethan*, the receiver for the company accused the accounting firm of *actively working* with the employees "to keep the bad news from the Board." *Id.* at 3. The accounting firm and the employees were therefore *not* totally independent; nevertheless, the Circuit Court found the lack of independence irrelevant. In any event, the intervening force here was not the failure to warn, but the operation of the LSP plant by Moore and Hundtofte. That LSP's operation was induced by the alleged failure to warn is irrelevant; as long as *any* intervening force occurs, the injury to property is indirect. *See Travelers Insurance Co. v. Turner, supra.*

None of the Virginia cases which applied the five-year period are factually similar to the present action. *Worrie v. Boze*, 198 Va. 533, 95 S.E.2d 192 (1957), involved breach of a covenant not to compete by an employee. Other cases involved the fraudulent sale of worthless stock where the plaintiff gave value at the time of the transfer. *See Arent v. Bray*, 371 F.2d 571 (4th Cir. 1967); *Trust Co. of Norfolk v. Fletcher*, 152 Va. 868, 148 S.E. 785 (1929). Nor does the case at bar involve a sale of property where the buyer gave value in reliance on a fraudulent representation by the seller concerning

certain features of the property itself. *See Progressive Realty Corp. v. Meador*, 197 Va. 807, 91 S.E.2d 645 (1956); *Westover Court Corp. v. Eley*, 185 Va. 718, 40 S.E.2d 177 (1956). And, obviously, this is not a case where an individual caused injuries for which the father must pay expenses, *Watson v. Daniel*, 165 Va. 564, 183 S.E. 183 (1936), or where a company discharges water on the property of another, *Southern Railway Co. v. Fitzpatrick*, 129 Va. 246, 105 S.E. 663 (1920).[2]

 For the reasons stated, the Court finds that under Virginia law, this is an action on a claim of a personal nature for indirect and consequential damage to plaintiff's property. The one-year limitation, therefore, applies to Count I insofar as it alleges a failure to warn by defendant. Since plaintiff himself admits that this cause of action accrued no later than July 24, 1975 (when LSP ceased operations), it is time-barred.

### B. *Count II*

Count II of the complaint alleges that on or about December 22 to 24, 1975, meetings were held between officials of Allied, Travelers and its underwriters, and Allied's public relations firm. According to plaintiff, at the meeting Allied and Travelers did associate, agree, mutually undertake or concert together for the purpose of maliciously and willfully injuring him in his reputation, trade, or business, in violation of *Va.Code Ann.* § 18.2–499.

Section 18.2–499 makes it illegal to conspire "for the purpose of wilfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . ." The statute provides

2. *Insurance Company of North America v. General Electric Co.*, 376 F.Supp. 638 (W.D.Va. 1974), on which plaintiff so heavily relies, is inappropriate here. In that case, a deep fryer erupted in flames and caused extensive damage to a building. Judge Dalton held that the five-year period applied in an action against the manufacturer because the initial harm to the building did not occur until the time of the fire; thus, all the damage, whether direct or consequential, occurred at one time. *Id.* at 648.

Judge Dalton was considering only a motion to dismiss, and he emphasized that the manufacturer still could prove intervening causes at a later date. *Id.* at 649. In any event, this Court has previously expressed its disagreement with *General Electric*, and adheres to its view that the analytical underpinning of that case was erroneous. *See Smithfield Packing Co. v. Dunham-Bush, Inc.*, 416 F.Supp. 1156 (E.D.Va. 1976).

a remedy for wrongful conduct directed to the business. Since the statute itself prescribes no limitation, the applicable period of limitations is determined by Section 8–24. *Federated Graphics Companies, Inc. v. Napotnik*, 424 F.Supp. 291 (E.D.Va.1976).

Allied and Travelers argue that Count II is actually a personal suit for defamation subject to the one-year period, and thus time-barred. Ordinarily, the Court would disagree. Although the alleged conduct might fairly be characterized as an action personal in nature (defamation and malicious prosecution), Section 18.2–499 "is applicable to *any* malicious conduct which injures a business." *Id.* at 294. The statute does not restrict its coverage to corporations; by speaking of injury to "another in his reputation, trade, business or profession," Section 18.2–499 also protects individuals who own and operate a business. As co-owner of LSP, and an active participant in the management of LSP, Moore was arguably within the coverage of the statute insofar as the complaint alleged that the conspiracy injured LSP's reputation, trade, or business.

However, the Court is convinced from the deposition of plaintiff Moore that the real nature of Count II is slander and libel. In interrogatories 18A, 20, 24, 25, and 31, Moore described in detail the monetary and investment losses which he had incurred as a result of the alleged conduct of Travelers and Allied. Yet, in his deposition, Moore testified as follows:

Q I take it, therefore, that with respect to the out-of-pocket losses that you assert for the value of your plant, for your criminal problems, and for the fees related to the criminal problems, for your OSHA fine and legal costs, and for your adipic acid losses that you assert, that those losses had all pretty much been established by this alleged conspiratorial meeting on December 24, 1975 irreversibly?

A Well, I don't believe I said that all of those losses were due to that meeting.

Q Well, that is what I am trying to establish and get you to tell me—exactly which losses you do attribute to the meeting. You don't attribute any of those to the meeting, do you?

MR. TAYLOR: Objection.

THE WITNESS: No.

BY MR. KOLODNY:

Q The die had been cast as to your relationship with Allied Chemical by that time, had it not?

A Yes.

Q So, your Agrinutrients profit loss that you are claiming was inevitable by that time?

A Well, I am not certain I follow that. I certainly had hoped to do something—oh, I am sorry. You said Agrinutrients?

Q Yes, sir.

A Oh, yes.

Q So, as to the out-of-pocket damages listed in your Interrogatory Answer Number 25 and your investment damages listed in answer to Travelers' Interrogatory Number 31, which I will show you briefly, those damages you don't assert to be the result of the allegations of Count II of this suit?

NOTE: The document was handed to the witness.

A May I see Count II, please?

NOTE: The witness examined the document.

A Would you restate the question?

Q *My question was whether or not you attribute any of the out-of-pocket losses listed in answer to Interrogatory Number 25 or any of your investment losses listed in answer to Interrogatory Number 31 to the allegations of Count II of the lawsuit?*

A This says 25 we are looking at here.

MR. TAYLOR: 31 is Exhibit A.

THE WITNESS: *No.*

(Moore Dep. pp. 1375–77) (emphasis added).

Since plaintiff does not claim that the alleged conspiracy caused damage to his investment and monetary losses in connection with LSP, he obviously is advancing a common-law claim for libel and slander to his personal reputation. This type of claim is not actionable under Section 18.2–499.

In *Federated Graphics, supra,* Judge Merhige rejected the notion that the statute codifies common-law actions. Rather, statutory coverage is afforded only when malicious conduct is directed at one's *business,* not one's *person. Id.* at 294. On the basis of the deposition of Moore, the Court finds that Count II does not state a claim actionable under *Va.Code Ann.* § 18.- 2–499.[3]

## C. *Count III*

Count III of the complaint alleges that Allied impliedly warranted that DMCP contamination was unlikely and of no significant concern. Because of this warranty, plaintiff allegedly was "lulled into a sense of security."

It is unnecessary for the Court to determine whether the one-year or five-year period is applicable to Count III. Plaintiff argues that Count III alleges a breach of an implied warranty of merchantability, or warranty of fitness for intended use. In Virginia, an action for a breach of warranty is governed by a four-year limitations period. *Va.Code Ann.* § 8.2–725 (1965). But the facts of this case do not remotely suggest that there has been a breach of warranty within the meaning of the Commercial Code of Virginia. An implied warranty of merchantability or a warranty of fitness for a particular purpose is made only when a sale of goods occurs. *See Va.Code Ann.* § 8.2–314 –315 (1965). A sale must involve the passing of title of goods from the seller to the buyer for a price. *Id.* § 8.2–106.

This case involved neither a passing of title nor a transfer of goods. Allied took to LSP all the raw materials necessary for the manufacture of Kepone. LSP processed the raw materials into Kepone and returned the finished product to Allied, which paid LSP for its services. Allied retained title to the raw materials and to the finished product at all times. Allied paid value to LSP, not vice versa. The compensation paid to LSP was for services rendered, not for goods conveyed. For these reasons, the Court holds that Count III fails to state a cause of action for breach of warranty of merchantability or for breach of warranty of fitness for a particular purpose within the meaning of the Virginia Commercial Code.

## D. *Count IV*

In Count IV, plaintiff alleges that Allied negligently misrepresented and concealed from him the true facts concerning the dangers of DMCP. The Court finds no difference between this allegation and the allegation of Count I that Allied failed to warn him of the dangers of Kepone. Moreover, the damages claimed in Count I and Count IV are identical. Therefore, for the reasons stated in the discussion of Count I (Section A–2) *supra,* the one-year period of limitations applies to Count IV. Since the alleged misrepresentation and concealment could have continued no later than July 24, 1975 (when LSP ceased all operations), and this suit was filed on July 1, 1977, Count IV is time-barred.

## E. *Count V*

Count V alleges that Allied intentionally defamed, libeled, and slandered the character of Moore by referring to him as the "world's expert" on Kepone and the "real culprit" in the Kepone disaster. Allied argues that the defamation claim is time-barred.

The statement in question was first issued to the Columbia Broadcasting System in November 1975 and nationally telecast on the popular television program "60 Minutes" on December 14, 1975. Even the conspiracy alleged in Count II occurred in De-

---

3. Plaintiff, of course, might argue that damage to his reputation would result in damage to his "business" or "profession" as a chemist. Under Section 8–24, however, such damage would be only to future earnings and profits—an indirect or consequential injury. More important, since injury to personal reputation ordinarily causes damage to one's business or profession, nearly every defamation action would fall within the coverage of Section 18.2–499. *Federated Graphics* obviously rejected this theory.

cember 1975, and the statements supposedly resulting therefrom were issued in early 1976. According to Allied, the one-year period of limitations applies. Since this action was not filed until July 1, 1977, Count V is supposedly time-barred.

Plaintiff concedes that Section 8–24 imposes a one-year period for defamation actions. However, he contends that defendant is liable for republications of the allegedly defamatory statements which occurred within the one-year period. As examples of republications, he cites several newspaper stories which were published in September 1976 and a rebroadcast of the "60 Minutes" feature in August 1976.

█ Actions for defamation are indeed governed by the one-year limitations period. See, e. g., Worrie v. Boze, 198 Va. 533, 95 S.E.2d 192, 195 (1957); Watson v. Daniel, 165 Va. 564, 183 S.E. 183 (1936). However, a separate cause of action will lie against the original publisher or wrongdoer for the republication of the libelous statement by a third party, when the republication is "the natural and probable result of what the wrongdoer did." Weaver v. Beneficial Financial Co., 199 Va. 196, 98 S.E.2d 687, 692 (1957). Thus, even if an action against the wrongdoer for the initial publication of the defamatory material is time-barred, he still may be liable for those republications which occurred within the one-year period of limitations.

█ The Court finds that, because of the one-year period of limitations, Allied cannot be held liable for the initial making of the allegedly defamatory statement and subsequent republications made prior to July 1, 1976. Nevertheless, Count V is not time-barred insofar as plaintiff seeks to hold Allied liable for republications of the allegedly defamatory statement occurring on or after July 1, 1976. If he can show that the statement was defamatory, he may be able to show that the republications of the statement were the natural and probable result of the original publication. The tragic and devastating physical effects of Kepone on the LSP workers were newsworthy items of national interest. Allied's

statements concerning the Kepone affair might have been considered of such significance and relevance that they would have been included in any subsequent publication concerning the plight of the LSP workers. Perhaps the truth is otherwise, but at this time, the Court cannot say that republication of Allied's statement over a long period of time could not be a natural and probable result of the original statement.

Thus, Count V is time-barred only as to those publications or republications occurring before July 1, 1976.

## F. Count VI

In Count VI, plaintiff charges that Allied and Hooker supplied dangerous chemicals to LSP without warning or instruction of possible dangers in the use of their products. Allied and Travelers are "strictly liable," he says, because the products were in a "defective condition unreasonably dangerous by reason of the absence of adequate warnings or instructions."

█ Plaintiff admits in his brief that Count VI is a claim of strict liability. Virginia, however, has not yet espoused the doctrine of strict liability in tort as stated in Restatement (2d) of Torts, § 402A. Matthews v. Ford Motor Co., 479 F.2d 399, 401 n. 2 (4th Cir. 1973); Brockett v. Harrell Brothers, Inc., 206 Va. 457, 143 S.E.2d 897, 902 (1965). On that ground alone, Count VI must fall.

Even if Count VI is considered as a claim that Allied and Hooker negligently, recklessly, or intentionally failed to warn Moore of the dangers of Kepone, the result is the same. Hooker supplied HCP to Allied, which then supplied all the raw materials necessary for the production of Kepone, including HCP, to plaintiff. For the reasons stated in the discussion of Count I (Section A–2) supra, the one-year limitations period applies, and Count VI is time-barred. The injuries which plaintiff claims are indirect or consequential because (1) he initially suffered injury when he made his agreement with Allied and commenced business at LSP without knowledge of the dangers of Kepone and (2) the operation of

the LSP plant was an intervening force without which the injuries claimed here could not have occurred.

### G. *Count VII*

In Count VII, Travelers is accused of negligence. Plaintiff contends that Travelers, which insured both Allied and LSP, was aware of Allied's former Kepone operation and in 1972 had classified it an "imminent danger." In 1974, Travelers made a series of inspections of the LSP plant and classified LSP as a "poor" risk for general liability purposes due to pollution exposure and "average" for workmen's compensation liability purposes. Moore complains that, despite its knowledge that LSP's policy excluded liability for pollution of the environment by LSP, Travelers negligently continued to inspect the LSP plant and gave advice and suggestions relating to safety. Thus, plaintiff says, he was "lulled into a false sense of security."

The Court finds that Count VII is governed by the one-year period of limitations of Section 8–24. The discussion of Count I (Section A–2) is equally applicable here. All the injuries claimed were an indirect or consequential result of the alleged conduct of Allied. Plaintiff first suffered injury when he entered into the contract and began production of Kepone without knowledge of the 1972 report, and first suffered injury after each inspection or rendering of advice when he continued producing Kepone. It was the operation and existence of the LSP plant, not the conduct of Travelers, which caused the various injuries for which plaintiff seeks damages. Count VII is of the same nature as the allegation made in *MacKethan v. Peat, Marwick, Mitchell & Co., supra* : that the defendant made it possible for the claimed injuries to occur through the operation of the LSP plant, because plaintiff would have prevented the disaster if Travelers had revealed the 1972 report to him, properly inspected the plant, or properly advised him of the dangers of Kepone. As in *MacKethan*, the one-year limitations period applies. Since Travelers' alleged conduct ceased no later than July 24, 1975, Count VII is barred by the statute of limitations.

In summary: Count I is DISMISSED as time-barred except insofar as it alleges the infliction of emotional distress; Counts II and III are DISMISSED; Count IV is DISMISSED as time-barred; Count V is DISMISSED except insofar as it attempts to hold Allied liable for republications made on or after July 1, 1976; Counts VI and VII are DISMISSED as time-barred.