Roger W. **LEVERTON**, Plaintiff,

v.

**ALLIEDSIGNAL, INC.,** Defendant.

No. Civ.A. 3:97CV695.

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 13, 1998.

---

Deborah Shae O'Toole, Cowan & Owen, Richmond, VA, for Plaintiff.

Michael Peter Oates, Hunton & Williams, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Roger W. Leverton instituted this civil action in the Circuit Court for the City of Richmond seeking damages under Virginia law for wrongful discharge from employment. Asserting diversity jurisdiction under 28 U.S.C. § 1332, the defendant, AlliedSignal, Inc. ("AlliedSignal"), filed a notice of removal to this Court. AlliedSignal has moved to dismiss the action, pursuant to Fed.R.Civ.P. 12(b)(6), arguing that Leverton has failed to state a claim upon which relief can be granted under Virginia law. For the following reasons, AlliedSignal's motion to dismiss is granted.

## STATEMENT OF FACTS

In deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the factual allegations in the initial pleading are, of course, taken as true. And, the plaintiff is entitled to the benefit of all reasonable inferences which may be drawn from the well-pled facts. The following recitation of facts conforms to these constraints.

AlliedSignal produces polyester tire yarn, a product used in the manufacture of automobile tires. Before 1986, customers of AlliedSignal expressed concern regarding the level of carboxyl ends ("COOH") in AlliedSignal's polyester tire yarn. Because COOH levels directly affect the breaking strength of the yarn, the customers implored AlliedSignal to reduce the COOH levels contained in the tire yarn. To achieve the level of durability in the product of its major competitor in the polyester tire-yarn market, AlliedSignal developed the "X" line of fiber in 1986. AlliedSignal thereafter represented to its customers that the "X" line contained lower levels of COOH and, hence, was more durable.

Leverton alleges that AlliedSignal subsequently increased the COOH levels in the "X" line of fiber so that they were approximately equal to the pre–1986 levels, an amount which had spawned expressions of concern from the company's customers. Notwithstanding numerous meetings held within AlliedSignal's Fibers Division about

the higher COOH levels and the company's disclosure obligations to its customers, AlliedSignal, according to the motion for judgment, failed to inform its customers of this fact because the company allegedly feared an adverse impact on sales. After learning about the increase in the COOH levels, Leverton, who was then the manager of business development of the Industrial Fibers Business Unit, expressed apprehensions about AlliedSignal's nondisclosure to its customers. In July 1996, Leverton alleges that he listed the failure of the company to communicate the elevated COOH levels as an exception on his annual Code of Conduct Report, which he submitted pursuant to company policy. According to Leverton, after he submitted the Code of Conduct Report his job responsibilities were transferred to another employee, he did not receive an expected salary increase, and his participation in departmental meetings was discontinued without explanation.

Leverton served successfully in various capacities as an AlliedSignal employee for more than thirty years. On May 21, 1997, Leverton was given a notice of termination, allegedly because of a reduction in force within the Fibers Division. This civil action ensued the termination of employment. The basis for the action is that AlliedSignal wrongfully terminated Leverton's employment in violation of Virginia's public policy exception to the employment-at-will doctrine.

## DISCUSSION

### A. The Analytical Framework

To succeed on a Rule 12(b)(6) motion to dismiss for failure to state a claim, the movant must demonstrate that "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The purpose of a Rule 12(b)(6) motion is to test "the sufficiency of [the] complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or

the applicability of defenses." *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.1992); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (2d ed.1990). When presented with a Rule 12(b)(6) motion to dismiss, the Court must decide "whether the claimant is entitled to offer evidence to support the claims." *Revene v. Charles County Comm'rs,* 882 F.2d 870, 871 (4th Cir.1989) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). Of course, in passing on a motion to dismiss "the allegations of the complaint should be construed favorably to the pleader." *Id.*

A federal court exercising diversity jurisdiction must apply the substantive law of the forum state. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When faced with an area of state law that is unclear, a federal court must predict how the highest court of the state would decide the issue if confronted with the same question. *See Kline v. Wheels by Kinney, Inc.,* 464 F.2d 184, 187 (4th Cir.1972); *Walker v. Winchester Memorial Hosp.,* 585 F.Supp. 1328, 1329 (W.D.Va.1984). The role of a federal court, in that circumstance, is to "determine the rule that the [state] Supreme Court would probably follow, not fashion a rule which ... an independent federal court might consider best." *Kline,* 464 F.2d at 187.

Against these legal principles, the Court must measure AlliedSignal's motion to dismiss.

### B. The Wrongful Discharge Claim Under Virginia Law

The employment-at-will doctrine,[1] pursuant to which either party in an employment relationship may end the association upon furnishing reasonable notice, is a firmly embedded precept of the common law of Virginia. The Supreme Court of Virginia has oft-stated:

---

1. Because Leverton has failed to allege that his employment contract with AlliedSignal provided for a definite term of employment, his employment with AlliedSignal is presumed to have been

terminable at-will. *See Perry v. American Home Prods. Corp.,* Civ. A. No. 3:96CV595, 1997 WL 109658, at *2 (E.D.Va. Mar.4, 1997).

Virginia adheres to the common-law rule that when the intended duration of a contract for the rendition of services cannot be determined by fair inference from the terms of the contract, then either party is ordinarily at liberty to terminate the contract at will, upon giving the other party reasonable notice.

An employee is ordinarily at liberty to leave his employment for any reason or no reason, upon giving reasonable notice, without incurring liability to his employer. Notions of fundamental fairness underlie the concept of mutuality which extends a corresponding freedom to the employer.

*Bailey v. Scott–Gallaher, Inc.*, 253 Va. 121, 480 S.E.2d 502, 504 (1997) (quoting *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 94, 465 S.E.2d 806, 808 (1996) (quotation marks omitted)); *see Lockhart v. Commonwealth Educ. Sys.*, 247 Va. 98, 439 S.E.2d 328, 330 (1994); *Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915, 916 (1987); *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797, 798 (1985); *accord Perry v. American Home Prods. Corp.*, Civ. A. No. 3:96CV595, 1997 WL 109658 (E.D.Va. Mar.4, 1997).

Virginia's commitment to the employment-at-will rule, however, is not absolute. Beginning with *Bowman v. State Bank of Keysville*, the Supreme Court of Virginia recognized the so-called "public policy exception" to the common-law employment-at-will doctrine. Bowman involved two at-will bank employees who were also shareholders of the bank's common stock. *Bowman*, 331 S.E.2d at 798. Seeking to acquire the necessary votes to approve a merger with another corporation, the president of the bank threatened the employee-shareholders with termination if they did not vote in favor of the corporate combination. *Id.* at 798–99. The plaintiffs, under duress and faced with the threat of discharge, voted, by proxy, in favor of the merger. *Id.* at 799. Shortly thereafter, the plaintiffs recanted their votes, informing the bank's president that their votes were procured "improper[ly]" and thus were "null and void." *Id.* (quotation marks omitted). Forced to abandon the merger because of a lack of shareholder support, the board of

directors of the bank voted to abandon the proposed combination. *Id.* By majority vote, the board also voted to discharge the plaintiffs. *Id.*

Finding that the threat of discharge seriously impinged the employee-shareholders' "otherwise unfettered discretion ... to vote freely his or her stock in [a] corporation," *id.* at 801, the Supreme Court of Virginia, in *Bowman*, permitted the discharged employees to prosecute an action in tort against their former employer for wrongful termination of employment. *Id.* The Court concluded that the plaintiffs' discharge was in violation of the public policy underlying Virginia's securities law, namely, a shareholder's right to vote shares free of duress. *Id.*

In so doing, Virginia's highest court incorporated, into the state's employment law, an exception to the employment-at-will doctrine. Two years later, in *Miller v. SEVAMP, Inc.*, the Supreme Court of Virginia reaffirmed its holding in *Bowman*, explaining that the termination of the *Bowman* plaintiffs was tortious "not because the employees had a vested right to continued employment, but because the employer ... misused its freedom to terminate ... at-will employees in order to subvert a right guaranteed to stockholders by statute." *SEVAMP*, 362 S.E.2d at 918.

Another significant development in the jurisprudence of the wrongful discharge exception under Virginia law occurred when the Supreme Court of Virginia decided *Lockhart v. Commonwealth Education Systems Corp.* in 1994. There, two employees instituted tort actions against their former employers, alleging that they wrongfully were terminated from their at-will employment because of their race and gender. *Lockhart*, 439 S.E.2d at 329–30. The trial court granted the demurrers filed by the employers and dismissed the actions. *Id.* Citing its decision in *Bowman*, the Supreme Court of Virginia reversed the dismissal of the actions, holding that the plaintiffs had pled cognizable claims because the terminations at issue violated the public policy of Virginia as set forth in the Virginia Human Rights Act, which guarantees individuals the "freedom to pursue em-

ployment free of discrimination based upon race or gender." *Id.* at 331.

In *Lockhart,* the Court expressly noted that it was relying upon the Virginia Human Rights Act not as the predicate for the claim, but only as the source of the public policy, the violation of which gave rise to the tort claim recognized in the public policy exception to the employment-at-will doctrine. *Id.* at 331–32.[2] Indeed, the Court declared that the predicate for the claim in *Lockhart* was to be found in the narrow exception to the common-law employment-at-will doctrine which it had crafted in *Bowman; see Bradick v. Grumman Data Sys. Corp.,* 486 S.E.2d 545, 546 (Va.1997); *Bailey,* 480 S.E.2d at 504.

The Supreme Court of Virginia, after *Lockhart,* further clarified its view of the limited exception to the at-will employment doctrine in *Lawrence Chrysler.* The plaintiff in *Lawrence Chrysler,* an employee in the defendant's automobile body repair shop, was told by his employer to repair a car by using a certain repair method. *Lawrence Chrysler,* 465 S.E.2d at 807–08. Believing that it was unsafe to do so, the plaintiff refused to repair the car in the manner instructed by the employer. *Id.* at 808. The insubordinate behavior of the plaintiff resulted in his termination. *Id.*

The plaintiff thereafter initiated a civil action against the defendant, alleging that, notwithstanding his status as an at-will employee, his discharge was in violation of a Virginia public policy. *Id.* Specifically, the plaintiff contended that repair of the car in the manner prescribed by the manager would result in a "violation of both statutory and common law duties, including duties under the Consumer Protection laws, the Auto-

mobile Salvage laws (Virginia Code §§ 46.2–1600 *et seq.*), and common law duties . . . concerning the exercise of due care." *Id.* at 809 (quotation mark omitted). The jury returned a verdict for the plaintiff, upon which the trial court, after remittitur, entered judgment. *Id.* at 807.

Reversing the judgment of the trial court, the Supreme Court of Virginia, in *Lawrence Chrysler,* stated:

> In *Bowman* and *Lockhart,* the *plaintiffs,* who were permitted to pursue causes of action against their former employers, *identified specific Virginia statutes in which the General Assembly had established public policies* that the former employers had contravened. Unlike the plaintiffs in *Bowman* and *Lockhart,* Brooks does not have a cause of action for wrongful discharge *because he is unable to identify any Virginia statute establishing a public policy* that Lawrence Chrysler *violated.*

*Id.* at 809 (emphasis added). Hence, *Lawrence Chrysler* teaches that a claim for wrongful discharge under *Bowman* cannot succeed unless the plaintiff identifies a Virginia statute establishing a public policy which was violated by the defendant in terminating the plaintiff.[3]

## C. Leverton's Claim for Wrongful Discharge

Leverton contends that his termination was in violation of the public policy of Virginia as reflected in the Virginia Consumer Protection Act of 1977 ("Consumer Protection Act"), Va.Code. §§ 59.1–196 et seq. (Michie 1992 & Supp.1997) In particular, Leverton alleges that: "[a]s a manufacturer and

---

**2.** Recently, the Supreme Court of Virginia has held that the General Assembly, in enacting the 1995 amendments to the Virginia Human Rights Act, has "plainly manifested an intent to abrogate the common law with respect to causes of action for unlawful termination of employment based upon the public policies reflected in the [Virginia Human Rights] Act." *Doss v. Jamco, Inc.,* 492 S.E.2d 441, 447 (Va.1997). Although the General Assembly has effectively overruled *Lockhart* by legislative action, the decision is nonetheless a pivotal case concerning the development and refinement of the wrongful discharge claim under Virginia law.

**3.** *See, e.g., Bradick v. Grumman Data Sys. Corp.,* 486 S.E.2d 545, 547 (Va.1997) ("[W]e hold that, based on the public policy expressed in the [Virginians with Disabilities Act] and [Virginia Human Rights Act] . . . the common law of Virginia provides a wrongful discharge remedy to an employee . . . where the employee is discharged on account of his disability . . . under the narrow exception recognized in *Bowman.*"); *Bailey,* 480 S.E.2d at 505 (stating that *Lawrence Chrysler* requires a plaintiff to "identify[ ] a statutory embodiment of the public policy of the Commonwealth" of Virginia).

supplier of products, AlliedSignal is required to comply with all laws governing truthful and accurate representation of the qualities, characteristics and ingredients in its products." (Mot. for J ¶ 16.) Leverton also pleads that: "[t]he public policy of Virginia concerning proper practices in the sale and market of products" is found in the Consumer Protection Act. Leverton, however, identifies no particular provision of the statute as the source of the policy component of his *Bowman* claim.

According to AlliedSignal, the Consumer Protection Act does not enunciate a Virginia public policy. Instead, AlliedSignal argues that the statute merely proscribes, as unlawful, certain practices in the sale of consumer goods and creates certain public and private remedies to redress violations of the statutory proscriptions. This, says AlliedSignal, precludes the *Bowman* claim.

AlliedSignal also argues that the Supreme Court of Virginia, in *Lawrence Chrysler*, "rejected the very statute relied on here—the Virginia Consumer Protection Act—as a cognizable basis for a public policy claim." (Def.'s Mem. P. & A. Supp. Def.'s Mot. Dismiss at 6.) On brief to the Supreme Court of Virginia, Brooks argued that his discharge violated, *inter alia*, the "Consumer Protection laws." The Court, however, did not express any opinion whether the Consumer Protection Act contained an expression of Virginia public policy. Indeed, the Court stated:

> We simply find no language in Code §§ 46.2–1600 through –1610 (which govern salvage, nonrepairable, and rebuilt vehicles) that supports Brooks' position. More telling, Brooks does not specify what precise statute that Lawrence Chrysler purportedly contravened.

*Lawrence Chrysler*, 465 S.E.2d at 809. Thus, the precise question before this Court—whether the cited provisions of the Consumer Protection Act set forth a public policy of Virginia adequate to sustain an action for wrongful discharge under Virginia law—has, to date, not been decided by the Supreme Court of Virginia.

The starting point for analysis is the text of the Consumer Protection Act which, in its opening section, announces "the intent of the General Assembly ... to promote fair and ethical standards of dealings between suppliers and the consuming public." Va.Code. Ann. § 59.1–197. To that end, the statute makes it unlawful for a supplier, involved in a "consumer transaction," who "[m]isrepresent[s] that goods or services have certain quantities, characteristics, ingredients, uses, or benefits." *Id.* § 59.1–200(A)(5). Accordingly, the Consumer Protection Act clearly: (1) expresses a legislative intent to establish certain parameters on the dealings between suppliers and the consuming public, *id.* § 59.1–197; (2) affords consumers a claim by which to seek redress when a supplier exceeds the statutory boundaries, *id.* 59.1–204; and (3) empowers the Attorney General to investigate and prosecute violations. *Id.* § 59.1–204.

The statute does not, in express terms, articulate a public policy. That, however, does not end the inquiry because the Supreme Court of Virginia has not held that the policy predicate of a *Bowman* claim can exist only if the statute uses the term "public policy." Moreover, as explained below, it appears that, in *Bowman*, the statute did not explicitly use that term. Nor has the Supreme Court of Virginia articulated a test by which to determine whether one of the Commonwealth's many statutes express a public policy which is sufficient to support a wrongful discharge claim under the *Bowman* exception.

Of course, it cannot be gainsaid that: (1) all statutes, to some extent, must reflect policy considerations; and (2) unless a statute is thought to be in the public interest, it presumably will not be enacted. Hence, in a very general sense, all statutes reflect public policy. However, there appear to be only two circumstances in which the Supreme Court of Virginia has found that a statute may be the source of public policy in the sense that term is used in Virginia's tortious wrongful discharge jurisprudence.

First, as in *Lockhart, Bailey* and *Bradick,* the Court has permitted *Bowman* claims to proceed on the basis of statutes which, in

their text, announce public policies.[4] Second, on one occasion, the Supreme Court of Virginia has found a public policy in a statute which conferred rights on a certain group of people but which did not enunciate a policy. *See Bowman,* 331 S.E.2d at 801. Specifically, in *Bowman,* the public policy appears to have been implied in the right to vote shares of corporate stock, *See id.* However, that is not entirely clear from the *Bowman* opinion. In a subsequent decision, the Court has commented that, in *Bowman,* the statute conferring the right to vote corporate shares (former Va.Code § 13.1–32, now Va.Code § 13.1–662) enunciated a public policy. *See Lawrence Chrysler,* 465 S.E.2d at 807. However, in *SEVAMP,* the Court described the policy in *Bowman* as "underlying" the statute which conferred the right to vote corporate stock. *See SEVAMP,* 362 S.E.2d at 917.

Hence, unlike the policy-enunciating statutes in *Lockhart, Bailey* and *Bradick,* it is difficult to place the statute in *Bowman* in a neatly defined category amenable to general extrapolation in analyzing state law wrongful discharge claims. Nor, does Virginia's post–*Bowman* jurisprudence precisely define the kind of non-policy-enunciating statute which will supply the policy predicate for a *Bowman* claim because, since *Bowman,* the Supreme Court of Virginia has not sustained a tortious discharge claim based on that sort of statute.

It is possible even to argue that, today, a *Bowman* claim cannot survive without a policy-enunciating statute which expressly provides the policy requisite of the claim. However, it is preferable for a federal court to avoid the temptation to generalize respecting state law, particularly where, as here, it is in such a degree of flux.

*SEVAMP,* however, offers a federal court, sitting in diversity, a measure of guidance respecting how to discern the source of the public policy predicate for a viable *Bowman* claim. There, the Supreme Court of Virginia explained:

> *Bowman* recognized an exception to the employment-at-will doctrine limited to discharges which violate public policy, *that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general. Each of the illustrative cases from other jurisdictions cited in Bowman involved violations of public policies of that character.* 229 Va. at 539–40, 331 S.E.2d at 801. The exception we recognized was not so broad as to make actionable those discharges of at-will employees which *violate only private rights or interests.*

*SEVAMP,* 362 S.E.2d at 918 (emphasis added).[5] *SEVAMP,* therefore, instructs that public policy, within the meaning of Virginia's tortious discharge jurisprudence, can be found in statutes that "protect property rights, personal freedoms, health, safety or welfare of the people in general," even if the statute does not enunciate a public policy *per se. See id.; Lockhart,* 439 S.E.2d at 330. Although *SEVAMP* does not provide a detailed formula for determining whether a statute is protective of these kinds of interests, it does require resort to the text of the statute at issue. And, it is in perspective of this instruction in *SEVAMP* that the Consumer Protection Act must be tested.

■ There is no doubt that the Consumer Protection Act does not expressly enunciate

---

**4.** *Compare* The Virginians with Disabilities Act, Va.Code § 51.5–1 (emphasis added) (providing that *"[i]t is the policy of this Commonwealth* to encourage and enable persons with disabilities to participate fully and equally in the social and economic life of the Commonwealth and to engage in remunerative employment") *with* The Virginia Human Rights Act, Va.Code § 2.1–715 (emphasis added) (stating that *"[i]t is the policy of the Commonwealth of Virginia* ... [t]o safeguard all individuals within the Commonwealth from unlawful discrimination because of," among other factors, "race ... [or] sex ... in employment").

It makes no difference to this analysis that the 1995 amendments to the Virginia Human Rights Act have limited the reach of *Lockhart* and *Bailey.*

**5.** Of course, *SEVAMP* involved no statute at all. Rather, the public policy source asserted by the plaintiff there was her employer's personnel manual. This, of course, was a "private right or interest" which was found not capable of supplying the public policy predicate of a *Bowman* claim.

public policy. Rather, its legislative purpose is to "promote fair and ethical standards of dealings between suppliers and the consuming public." Hence, the public policy predicate of Leverton's claim is not a policy-enunciating statute such as those in *Lockhart, Bailey* or *Bradick*.

Nor can the Consumer Protection Act be said to protect property, personal freedom, health, safety or welfare of the people in general. Instead, the statute, by its terms, protects against unfair and unethical dealings between suppliers and the consuming public. To that extent, the statute no doubt inures to the benefit of the people at large for it reasonably can be assumed that the consuming public, at least in theory, is the people at large. However, the fact that the public generally benefits from a statute does not mean necessarily that the statute protects the category of interests which were defined by the Court as public policy sources in *Bowman* and *SEVAMP*. An examination of the Consumer Protection Act discloses no intent to protect personal freedom, health, safety or welfare of the people at large. Nor does the statute disclose an intent to protect property interests of the people at large, except perhaps that, in the most general sense, fair and ethical dealings generally serve the economic interests of consumers.

Many, if not most, statutes which regulate economic activity and commerce can be said, in a general way, to protect property interests. Some might even be said to secure personal freedom and general welfare interests in the economic sense of those terms. However, if statutes of that sort were sufficient to supply the public policy predicate for a *Bowman* claim, the limited exception, which for years the Supreme Court of Virginia has been at considerable pains to tightly restrict, soon would become so expansive as to be swallowed in its entirety.

Even if the Consumer Protection Act is construed to implicate interests of the kind which *Bowman* and *SEVAMP* define as adequate to provide the public policy predicate of a *Bowman* claim, Leverton could not rely on it to sustain his claim. This is because, in each instance where the Supreme Court of Virginia has permitted a *Bowman* claim, it has found that the discharged employee fell within the protective reach of the statute which supplied the public policy component of his or her claim. In *Bowman*, the employees were shareholders whose statutory rights, as shareholders, were infringed by the discharge. In *Lockhart, Bailey* and *Bradick*, the employees were members of the class of persons who were protected from discrimination by the policy-enunciating statutes.

Leverton's termination deprived him of no interest or right secured to him by the Consumer Protection Act. For this additional reason, Leverton's tort claim for wrongful discharge does not pass muster under the Virginia decisions which have defined viable claims of that kind.

## CONCLUSION

It is safe to say that Virginia's employment-at-will doctrine has been in a state of flux since its creation in *Bowman* in 1987 and particularly since 1994 when *Lockhart* was decided. Recent decisions of the Supreme Court of Virginia, however, have clarified many of the issues which have troubled both federal courts and Virginia's trial courts since recognition of the "narrow" exception in *Bowman*.

Although it has supplied useful guidance on the issue, Virginia's highest court has not yet defined the test for ascertaining which of the hundreds of state statutes may supply the public policy predicate for a *Bowman* claim. Under that circumstance, a federal court, sitting in diversity, must strive to forecast how the Supreme Court of Virginia would determine that issue and then follow that prescribed course.

On this record, and in perspective of the statute on which Leverton bases his claim, this Court concludes, for the reasons set forth above, that the Supreme Court of Virginia would find that Leverton's claim is beyond the reach of the limited exception to Virginia's common-law employment-at-will doctrine, as the exception was articulated in *Bowman* and applied in subsequent decisions of Virginia's supreme tribunal. Accordingly, AlliedSignal's motion to dismiss is granted

and the action will be dismissed with prejudice.

The Clerk is directed to send copies of this Memorandum Opinion to counsel of record.

It is so ORDERED.