**David W. WARNER, Plaintiff,**

v.

**BUCK CREEK NURSERY, INC., et al., Defendants.**

**No. CIV. A. 3:00CV00092.**

United States District Court, W.D. Virginia, Charlottesville Division.

May 21, 2001.

ery, Inc. ("Buck Creek"), Robert C. West, Jr., and Kimberly Dickerson, based on alleged conduct arising out of his employment with Buck Creek and the termination thereof. Mr. Warner has asserted the following causes of action in ten separate counts: (1) failure to pay proper overtime compensation in violation of the Fair Labor Standards Act; (2) interference with and retaliation for the exercise of rights under an employer-provided disability insurance plan in violation of the Employee Retirement Income Security Act; (3) retaliation for having filed a workers' compensation claim and for having the intention to file another; (4) wrongful discharge in violation of Virginia public policy; (5) publication and republication of malicious and false statements in violation of Section 8.01–45 of the Virginia Code; (6) defamation; (7) defamation per se; (8) intentional infliction of emotional distress; (9) tortious interference with business relations; and (10) conspiracy to injure reputation and business reputation. The defendants moved to dismiss certain counts of Mr. Warner's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief could be granted. For the reasons stated in this opinion, the defendants' motion to dismiss will be granted in part and denied in part.

John E. Davidson, Davidson & Kitzmann, PLC, Charlottesville, VA, for Plaintiff.

Dexter Brock Green, Jones & Green, Charlottesville, VA, for Defendant.

## OPINION

MOON, District Judge.

The Plaintiff, Mr. David Warner, filed a multiple-count complaint in this Court against the defendants, Buck Creek Nurs-

## I. FACTS

What follows are the facts as alleged in Mr. Warner's complaint. Mr. Warner was employed by Buck Creek from March 10, 1994 until November 8, 2000. According to Mr. Warner, during the three years leading up to his termination, he routinely worked more than 40 hours per week. Mr. Warner alleges that during this time he ordinarily worked 50 hours per week and received a regular rate of pay that was between $14 and $17 per hour. According

to Mr. Warner, Buck Creek and Robert West, a part owner and general manager of Buck Creek, willfully refused to pay him at a premium hourly rate, or "time and a half" of his regular rate of pay, for the hours that he worked in excess of 40 hours per week. Mr. Warner alleges that the defendants continued this practice with full knowledge that their actions were in violation of federal law governing compensation for overtime.

In 1996, Mr. Warner suffered severe back injuries, including a herniated disc and a bulging disc, while performing manual labor for Buck Creek. After Mr. Warner's injury, Mr. West demanded that he not make a workers' compensation claim. According to Mr. Warner, Mr. West stated that Buck Creek would continue to pay him while he recovered from his injuries if he did not make a workers' compensation claim. Mr. Warner alleges that he was concerned about Mr. West's demand that he not file a workers' compensation claim because a year earlier another employee who was persuaded by the company not to file a claim was subsequently mistreated and forced to leave his employment. Nevertheless, despite Mr. West's demand, Mr. Warner filed a workers' compensation claim and received compensation for his injuries and absences from Buck Creek's insurance carrier.

After recovering from his initial back injury, Mr. Warner returned to work at Buck Creek, but his back continued to cause him pain, and the injury eventually forced him to undergo surgery in May 1998. According to Mr. Warner, again against Mr. West's wishes, he obtained workers' compensation coverage for the surgery and the resulting absences from work. By January 1999, Mr. Warner had recovered sufficiently from his injuries so that he could return to work at Buck Creek.

Upon his return, Mr. Warner alleges that Buck Creek began treating him poorly by giving him undesirable assignments, making snide remarks about him, and being extremely disrespectful towards him. According to Mr. Warner's complaint, the company's actions indicated that it was retaliating against him because he had exercised his right to assert a workers' compensation claim in the face of the company's demand to the contrary. Nevertheless, despite his continued back pain and the defendants' retaliation against him, Mr. Warner alleges that he continued to work at Buck Creek because he need the income to support his family.

On August 1, 2000, Mr. Warner again fell victim to serious injury-this time by accidently shooting himself in the upper chest while at home cleaning his 22 caliber gun. The injury from the gunshot kept Mr. Warner from working for roughly one month, during which time he received a percentage of his ordinary income from Buck Creek's employee disability insurance plan. According to Mr. Warner, the defendants made it clear to him that they did not want him to exercise his right to receive disability benefits. As an example, Mr. Warner alleges that Mr. West visited him at his home a few days after the accident and indicated that he wanted him to return to work immediately, stating that Mr. Warner "still [had] one good arm." In addition, Mr. Warner alleges that during the same visit Mr. West attempted to persuade Mr. Warner's wife to tell him to go back to work instead of remaining on disability. Subsequently, Mr. Warner alleges that Mr. West sent him a letter in which he stated that "I am relieving you of your duties for [your] position and terminating the wage rate that you have received for that position effective immediately." Mr. West's letter did indicate, however, that he "presume[d]" that there would be another

position at Buck Creek for Mr. Warner upon his return. The letter also claimed that Mr. West had "received no communication from [Mr. Warner] regarding [his] work status since [his] last day of work on August 1, 2000," but Mr. Warner alleges that he had in fact told Mr. West on two different occasions that his surgeon had indicated that his gunshot wound would not allow him to return to work until after September 1, 2000.

Mr. Warner returned to work at Buck Creek on September 5, 2000, and he performed the same job duties that he had performed before his injury, but he was paid only $14 per hour, whereas he had received $16.50 per hour before his accident. According to Mr. Warner's complaint, the pay cut was in retaliation for his having claimed disability benefits as a result of his gunshot injury. Mr. Warner also alleges that the defendants again treated him poorly upon his return to work and indicated by "hints and behavior" that he was being punished for having gone on disability after his gun accident.

In early October 2000, Mr. Warner alleges that he was summoned to Mr. West's office for a meeting with Mr. West and Tony Bennett, another part owner of Buck Creek. At this meeting, Mr. West and Mr. Bennett accused Mr. Warner of having stolen an automotive part from Buck Creek. In support of the charge, Mr. West informed Mr. Warner that on September 29, 2000 someone had bought automobile ball joints from an auto parts store for his or her personal use and had charged the purchase to Buck Creek. In addition, Mr. West and Mr. Bennett showed Mr. Warner a receipt from the auto parts store, but according to Mr. Warner the signature line was blank. Mr. Warner vehemently denied having stolen from the company, and he alleges that Mr. West and Mr. Bennett knew or should

have known that the accusation was false. According to Mr. Warner's complaint, Kimberly Dickerson, the office manager of Buck Creek, in conjunction with Mr. West and Buck Creek, fabricated the theft charges against Mr. Warner because of her personal dislike for him.

According to Mr. Warner, despite the false accusations and mistreatment, he continued to work for Buck Creek in order to provide for his family, but, in late October 2000, his back condition deteriorated, forcing him to make two separate visits to the emergency room on October 25 and to miss several days of work. Mr. Warner again received coverage from Buck Creek's workers' compensation carrier, but Mr. Warner alleges that Mr. West again "indicated his extreme displeasure" with Mr. Warner's having claimed workers' compensation.

On November 8, 2000, Mr. Warner was fired by Buck Creek. The termination letter that Mr. Warner received indicated that he was being fired because he had committed theft by purchasing auto parts for his personal use and then charging those parts to Buck Creek. The letter also accused Mr. Warner of "deliberately lying" to his superiors when asked about his involvement in the theft. Mr. Warner alleges that, both before and after his termination, the defendants told many people, including employees of Buck Creek, that he committed theft and that he was being fired as a result of the theft. According to Mr. Warner's complaint, the defendants made these statements with malice or with reckless disregard for their truth and with the intent to destroy his reputation in the community. Mr. Warner alleges that defendants Buck Creek and Mr. West made the statements in order to disguise their true reason for terminating him, which was to retaliate against him for exercising his rights under the workers' compensa-

tion laws of Virginia and under the ERISA-governed disability insurance plan provided by Buck Creek to its employees. Mr. Warner alleges in his complaint that Ms. Dickerson made the statements because of her "personal dislike" for him. It is out of the facts stated above that the numerous causes of action alleged in Mr. Warner's complaint arose.

## II. STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), the Court must consider all facts and reasonable inferences which may be drawn from the face of the plaintiff's complaint to determine whether all of the required elements of the cause of action are present. *Oram v. Dalton,* 927 F.Supp. 180, 184 (E.D.Va.1996) (citing *Wolman v. Tose,* 467 F.2d 29, 33 n. 5 (4th Cir.1972)). This means that all factual allegations in the plaintiff's complaint must be accepted as true, *Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 217–18 (4th Cir.1994), and should be construed liberally, *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991). The Court may not dismiss the complaint unless it is apparent that the plaintiff would not be entitled to relief. *Id.*

## III. DISCUSSION

Mr. Warner's complaint alleges various causes of action in the form of ten different counts, and the defendants have moved to dismiss counts two, three, four, eight, nine, and ten of the complaint for failure to state a claim for which relief can be granted. The Court will now address the disputed counts in turn.

A. *Count Two: Interference with and Retaliation for the Exercise of Rights under an ERISA Plan*

In Count Two of his complaint, Mr. Warner alleges that Buck Creek and Mr.

West violated the interference clause of Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, by interfering with and retaliating against him for exercising his rights under Buck Creek's ERISA-governed disability insurance plan. As a result of this violation, Mr. Warner requests that the Court award him equitable relief, including back and front pay, in addition to his reasonable attorney fees and costs. Buck Creek and Mr. West have set forth several different arguments in support of their contention that Count Two fails to state a claim. The Court will address the defendants' arguments in the order in which they were made and will explain why each argument is insufficient to support a motion to dismiss.

First, the defendants contend that Mr. Warner does not state a claim under Section 510 for interference with rights under an ERISA plan because he has alleged "no facts even suggesting that either defendant interfered with his receipt of [ERISA] benefits." In his response brief, Mr. Warner "freely admits that he was not prevented from receiving benefits," but points out that Section 510 also prohibits retaliation against an employee for seeking and receiving benefits. Mr. Warner's point is well taken, for, in addition to forbidding interference with the attainment of rights under an ERISA plan, Section 510 of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140; *see also Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir.1996) (en banc) ("[ERISA § 510] prohibits two types of discrimination .... First, an employer may not discriminate against an employee with the purpose of interfering with an

employee's *exercise* of certain rights. Second, an employer may not discriminate against an employee with the purpose of interfering with an employee's *attainment* of certain rights."). Thus, while Mr. Warner admits that he does not state a claim under Section 510 for interference with the attainment of rights under an ERISA plan, it appears to the Court that he does state a claim under Section 510 for discriminatory retaliation on account of his exercising his rights under an ERISA plan.

■ The defendants' second argument is that Mr. Warner has failed to state a claim under Section 510 because he has not alleged that the defendants made a "conscious decision" or had the "specific intent" to retaliate against him for exercising his ERISA rights. The defendants assert that, for purposes of surviving a 12(b)(6) motion, Mr. Warner must "allege facts showing that defendants knew he had obtained disability benefits in the recent past" in order show that the defendants had the specific intent to retaliate against him for exercising his ERISA rights. Although it may be true that in order to prevail at trial Mr. Warner will have to prove that the defendants made a conscious decision or had a specific intent to retaliate against him, *see Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir.1991) (stating that plaintiff must "prove a specific intent of the employer to interfere with an employee's pension rights"),[1] the Court does not believe that it is necessary for Mr. Warner to have used the words "specific intent" or "conscious decision" in his complaint in order to state a claim under Section 510. *See Heimann v. National Elevator. Indus. Pension Fund*, 187 F.3d 493, 509 (5th Cir. 1999) ("The use of the term 'specific intent'

or other ERISA terminology is not sacramental or necessary to the pleading of a cause of action under [ERISA] § 502(a).").

■ Furthermore, the Court disagrees with the defendants' contention that Mr. Warner's complaint must allege specific facts showing that the defendants knew he had obtained benefits in the recent past. All that the Federal Rules of Civil Procedure require Mr. Warner to do at the pleading stage is to set forth a "short and plain statement of the claim showing that [he] is entitled to relief," Fed.R.Civ.P. 8(a), and Mr. Warner has met this burden. Count Two of the complaint states that, "[b]y interfering with and retaliating against Mr. Warner for exercising his rights pursuant to the ERISA-governed insurance plan provided by Buck Creek, defendants Buck Creek and Mr. West violated the interference clause of Section 510 of ERISA." The complaint also makes factual allegations such as that the defendants "clearly did not want Mr. Warner to exercise his rights to receive benefits for his disability" and that "Mr. West continued to express his significant displeasure with Mr. Warner being out on disability." In addition, the complaint alleges that defendants Mr. West and Buck Creek made false statements about Mr. Warner in order to "disguise their real motive for terminating [him], which was to retaliate against him for exercising his rights under ... the ERISA-governed disability insurance plan provided to Buck Creek's employees." Even though Mr. Warner may not have used the specific language demanded by the defendants, the allegations contained in his complaint provide a more than sufficient basis from which the Court can infer that all of the required elements of his Section 510 claim, including specific

---

**1.** While *Conkwright* set forth the requirement of specific intent in the context of an "attainment" claim, the Court sees no reason, nor have the parties posited any, why specific intent should not also be required in "exercise" claims such as Mr. Warner's.

intent, are present. *See Wolman,* 467 F.2d at 33 n. 5; *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (noting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). Thus, because Mr. Warner's complaint is sufficient to "give the defendant[s] fair notice of what [his] claim is and the grounds upon which it rests," the Court holds that Mr. Warner has stated a claim under Section 510. *Conley,* 355 U.S. at 47, 78 S.Ct. 99.

■ A third argument presented by the defendants is that Mr. Warner's Section 510 claim should be dismissed because he has "alleged no facts indicating he was qualified for the position" he held at the time of the defendants' alleged interference with his ERISA rights. In support of this argument, the defendants cite *Mannell v. American Tobacco Co.,* 871 F.Supp. 854, 862 (E.D.Va.1994) (stating, the context of an "attainment" claim, that a prima facie case under Section 510 requires the plaintiff to prove that "she '(1) belongs to the protected class, (2) was qualified for the position involved, and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent was present'" (quoting *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 347 (3rd Cir. 1990))). While it is true that *Mannell* sets forth a qualification requirement as part of the prima facie case under Section 510, *Mannell* was decided in a different proce-dural posture from the case at bar. The *Mannell* Court was faced with a motion for summary judgment, and it reviewed the plaintiff's evidence under the burden-shifting framework used to analyze circumstantial evidence of discrimination. Thus, while Mr. Warner eventually may have to set forth evidence that he was qualified for the position in order to survive a motion for summary judgment, he does not need to address the prima facie elements in his complaint in order to survive a motion to dismiss under Rule 12(b)(6). As explained above, Mr. Warner has met his burden at the pleading stage of setting forth a short and plain statement of his claim sufficient to give the defendants "fair notice of what [his] claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99.[2]

The defendants' fourth argument concerns the relief requested by Mr. Warner for the defendants' alleged violation of Section 510. In his complaint, Mr. Warner requests, *inter alia,* "equitable relief, including back pay and front pay." The defendants argue that, because monetary and compensatory damages are not allowed under Section 510, Mr. Warner's claim for such damages must be dismissed. Thus, the issue is whether back pay and front pay constitute equitable relief under ERISA. Although the Supreme Court has stated that compensatory damages are not equitable relief allowed under Section 502(a)(3) of ERISA, *see Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255–59, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993),[3] the fact that relief may come in monetary form does not necessarily mean that such relief is not

**2.** The Court notes that, even if Mr. Warner were required to plead the elements of his prima facie case, the facts and allegations contained in his complaint fulfill this task, if all reasonable inferences from those facts and allegations are drawn in his favor.

**3.** In ruling on the compensatory damages issue, the *Mertens* Court specifically rejected the argument that relief can be characterized as equitable for purposes of Section 502(a)(3) simply because it is of the sort that could be provided by a common-law court of equity. *See* 508 U.S. at 257–58, 113 S.Ct. 2063.

equitable in nature, *see Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 570, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990).

The Court will address the issue of back pay first. In *Terry,* the Supreme Court noted that monetary awards can be characterized as equitable "where they are restitutionary." 494 U.S. at 570, 110 S.Ct. 1339. However, the *Terry* Court found that the back pay sought by the respondents in that case was "not money wrongfully withheld by the Union, but wages and benefits they would have received from [their employer] had the Union processed the employees' grievances properly" and that "[s]uch relief is not restitutionary." *Id.* at 570–71, 110 S.Ct. 1339. In arriving at that result, the *Terry* Court distinguished *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), by noting that the back pay awarded in that case was "incident to [the district court's] injunctive powers" under the Fair Labor Standards Act and that the "back pay in that case was restitutionary." *Terry,* 494 U.S. at 571, 110 S.Ct. 1339.[4] In addition, the *Terry* Court distinguished the damages sought from the Union in that case from the back pay sought from an employer in a Title VII case, which "would generally be restitutionary in nature." *Id.* at 572, 110 S.Ct. 1339. ("Furthermore, the Court has noted that backpay sought from an employer under Title VII would generally be restitutionary in nature ..., in contrast to the damages sought here from the Union."

(citing *Curtis v. Loether,* 415 U.S. 189, 197, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974))).

■ In *Schwartz v. Gregori,* 45 F.3d 1017 (6th Cir.1995), the Sixth Circuit addressed the issue, in light of *Mitchell, Terry,* and *Mertens,* of whether back pay is "appropriate equitable relief" under Section 502(a)(3)[5] that can be awarded to an individual who has been the victim of retaliation in violation of Section 510 of ERISA. *See id.* at 1020–23. The *Schwartz* Court compared the ERISA retaliation claim before it to the FLSA retaliation claim in *Mitchell* and stated that "the back pay at issue in this case was awarded against the employer rather than a third party, and thus operates to restore to the plaintiff that to which she would have enjoyed but for the employer's illegal retaliation." *Id.* at 1022. Thus, the Sixth Circuit held that the back pay awarded in that Section 510 case "constituted restitution, and therefore is an equitable remedy available under § 502(a)(3)." *Id.* at 1023; *see also Mertens,* 508 U.S. at 255, 113 S.Ct. 2063 (noting that restitution can be an equitable remedy). Although there appears to be no authority on point within the Fourth Circuit, the Sixth Circuit's view of back pay as an equitable remedy for a violation of Section 510 of ERISA has found support in other federal courts. *See, e.g., Russell v. Northrop Grumman Corp.,* 921 F.Supp. 143, 152 (E.D.N.Y.1996) (citing *Schwartz* for the proposition that a back pay award against an employer would be restitutionary in nature and therefore available as a remedy under Section 502(a)(3) of

---

4. In *Mitchell,* the Court ruled that a district court has the equitable power under the Fair Labor Standards Act to order an employer to pay lost wages to an employee who has been the victim of retaliatory discharge or discrimination. *See* 361 U.S. at 291–93, 296, 80 S.Ct. 332.

5. According to Section 502(a)(3) of ERISA, "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter." 29 U.S.C. § 1132(a)(3).

ERISA). Thus, in the apparent absence of any contrary authority within the Fourth Circuit, this Court will follow the reasoning of the Sixth Circuit in *Schwartz* and will hold that back pay is available as an equitable remedy under Section 502(a)(3), should Mr. Warner prevail on his Section 510 claim. As a result, the Court will not dismiss Mr. Warner's claim for back pay.

■ The question of whether front pay is available as an equitable remedy under Section 502(a)(3) for a violation of Section 510 of ERISA is an easier one. In *Schwartz*, the Sixth Circuit noted that "[f]ront pay is awarded only when the preferred remedy of reinstatement, indisputably an equitable remedy, is not appropriate or feasible." 45 F.3d at 1023. Therefore, the Sixth Circuit concluded, in keeping with its characterization of front pay in other contexts, that front pay "is an equitable remedy and consequently available under ERISA § 502(a)(3)." *Id.* Although it does not appear that the Fourth Circuit has resolved the front pay issue in the ERISA context, the Fourth Circuit has indicated in the ADEA context that front pay is an equitable remedy when granted as a substitute for reinstatement. *See Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir.1991) (stating that, "[w]hile reinstatement, which is clearly an equitable remedy, is the much preferred remedy, front pay may serve as a substitute or complement" and concluding that an award of front pay is "for the court sitting in equity to consider and not the jury"). As a result, in light of *Schwartz* and *Duke*, the Court will hold that front pay, when sought as a substitute for reinstatement, is an available equitable remedy under Section 502(a)(3) and will not dismiss Mr. Warner's claim for front pay.

■ The last argument [6] set forth by the defendants in opposition to Mr. Warner's Section 510 claim is a two-pronged attack. First, the defendants assert that the claim must be dismissed as to Mr. West because a retaliation action under Section 510 "may only be brought against an employer because only the employer can discharge or discriminate by interfering with or retaliating against the employee for his pursuit of private disability insurance benefits." Second, the defendants argue that the Section 510 claim must fail as to Mr. West because "a corporate director acting on behalf of the corporation cannot be sued separately as an 'individual' under the statute." The first prong of the defendants' argument has been specifically rejected by the Fourth Circuit, *see Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 420–21 (4th Cir.1993) ("In light of the plain language of [Section 510 of ERISA], we cannot agree with the defendants that Congress intended to limit those who could violate [Section 510] to employers."); consequently, the first prong of the defendants' argument will be rejected by this Court as well.

While the second prong of the defendants' argument has more appeal, the defendants have cited no case law to support

6. Actually, the last argument presented in the defendants' brief concerns Mr. Warner's demand for a jury trial. The defendants point out that a jury trial is unavailable in a cause of action under Section 510 of ERISA. In his memorandum in opposition to the defendants' motion to dismiss, Mr. Warner acknowledged that there is no right to a jury trial for his ERISA cause of action and joined in the defendants' motion to strike the demand as to the Section 510 claim. Nevertheless, Mr. Warner also stated that he anticipates that he will request the court to empanel an advisory jury. In their reply memorandum, the defendants oppose an advisory jury. However, seeing as no request has actually been made, the Court has no need to rule at this time on the issue of an advisory jury for Mr. Warner's ERISA claim.

it; thus, in light of the plain language of the relevant statutes and the Fourth Circuit's decision in *Custer*, the Court must also reject the second prong of the defendants' argument. Section 510 states that "[i]t shall be unlawful for *any person* to discharge fine, suspend, expel, discipline, or *discriminate* against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140 (emphasis added). The imposition of liability on "any person" who engages in the prohibited conduct described in the statute is significant because the term "person" is defined broadly under ERISA. *See id.* § 1002(9) (stating that the term "person" means "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization"). Also, the fact that Congress included the term "discriminate," which is a verb that is potentially broad in scope, *see Custer*, 12 F.3d at 421, indicates that the provisions of Section of 510 could be violated by an "individual" such as Mr. West, *see id.* at 423 (concluding, in a case involving insurance company defendants, that "an action under 29 U.S.C. § 1140 may be brought against any person, as that term is defined by ERISA"). Therefore, because Mr. West is an "individual," and consequently a "person" subject to liability under Section 510, the Court holds that Mr. Warner has at least stated a claim under Section 510 of ERISA against Mr. West. As a result, for all of the foregoing reasons, the Court will deny the defendants' motion to dismiss Count Two of Mr. Warner's complaint.

### B. Count Three: Workers' Compensation Retaliation

In Count Three of his complaint, Mr. Warner alleges that defendants Buck Creek and Mr. West violated Section 65.2–308(A) of the Virginia Code by discharging him "because he filed a workers' compensation claim and intended to file another." For this violation, Mr. Warner requests actual damages, as well as reasonable attorney fees and costs. According to Section 65.2–308(A), "[n]o employer or person shall discharge an employee solely because the employee intends to file or has filed a claim [for workers' compensation]." Under the statute, an employee

> may bring an action in a circuit court having jurisdiction over the employer or person who allegedly discharged the employee in violation of this section. The court shall have jurisdiction, for cause shown, to restrain violations and order appropriate relief, including actual damages and attorney's fees to successful claimants and the rehiring or reinstatement of the employee, with back pay plus interest.

Va.Code Ann. § 65.2–308(B). The defendants have urged that Count Three be dismissed as to one or both of them for several reasons.

■ First, the defendants contend that Count Three should be dismissed in its entirety because Mr. Warner has failed to "allege that he was discharged 'solely' for exercising his rights under the workers compensation laws." According to the defendants, because Mr. Warner alleges other reasons for his discharge (e.g., his pursuit of disability benefits), he fails to state a claim for workers' compensation retaliation on the face of his complaint. Although it may be true that in order to prevail on his claim under Section 65.2–308 Mr. Warner must prove that workers' compensation retaliation was the sole reason for his discharge, the defendants' argument must be rejected here because it fails to acknowledge Mr. Warner's right to set forth alternative, inconsistent causes of action in his complaint. *See* Fed.R.Civ.P.

8(e) ("A party may ... state as many separate claims or defenses as the party has regardless of consistency ....").[7]

■ The defendants' second argument is that, "[b]ecause nowhere in his Complaint is it alleged that defendants knew he intended to file another workers' compensation claim, the portion of his cause of action [under Section 65.2–308] which relies on his intent to file a workers' compensation claim must be dismissed." The defendants' argument is not well taken, for it would require Mr. Warner to go beyond the notice pleading standards established by the Federal Rules of Civil Procedure. Count Three of Mr. Warner's complaint is sufficient to "give the defendant[s] fair notice of what [his] claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99. Therefore, the Court will reject the defendants' second argument.

■ The defendants' third argument is that even if Mr. Warner has stated a claim against Buck Creek, Count Three must be dismissed as to Mr. West. The Court disagrees. The defendants assert that Mr. West should not be subject to liability under Section 65.2–308 because he was acting as an employee of Buck Creek when he terminated Mr. Warner and because he is a shareholder of Buck Creek. However, the only authority that they have provided for their proposition is a corporate veil-piercing case decided in a different context, *see Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212–13, 360 S.E.2d 828, 831 (1987), and the Court has not found any authority that is more relevant to the case at bar. In addition, the defendants' view is at odds with the language of the statute. Section 65.2–308 states that "[n]o employer or person shall discharge an employee solely because the employee intends to file or has filed a claim [for workers' compensation]." Mr. West is a "person" who discharged Mr. Warner. Thus, in light of the plain language of Section 65.2–308 and the lack of relevant authority for the defendants' position, the Court holds that Mr. Warner has stated a claim for workers' compensation retaliation against both Buck Creek and Mr. West.

■ The final issue to be considered with regard to Mr. Warner's claim under Section 65.2–308 is whether the statute affords him a right to a jury trial. The Virginia Supreme Court has declined to answer this question. *See Mullins v. Virginia Lutheran Homes, Inc.*, 253 Va. 116, 120 n. 2, 479 S.E.2d 530, 533 n. 2 (1997) (finding no need to address the defendant's contention on appeal that the plaintiff was not entitled to a jury trial on her 65.2–308 claim because the issue had not been raised at trial). In addition, two United States District Court opinions that have dealt with the subject have come to different conclusions. *Compare Dunn v. Bergen Brunswig Drug Co.*, 848 F.Supp. 645, 648–49 (E.D.Va.1994) (holding that "section 65.2–308 does not give rise to a right to a jury trial"), *with Valentine v. Roanoke Podiatry & Foot Surgery, P.C.*, 1997 WL 573412, at *3–*4 (W.D.Va. May 15, 1997) (denying the defendant's motion to strike

---

**7.** The defendants also argue that, even if pleading in the alternative, Mr. Warner must allege that workers' compensation retaliation was the "sole" reason for his discharge. However, the defendants have cited no authority for the position that Mr. Warner needed to use the word "solely"—or other similar language—in his complaint in order to state a claim under Section 65.2–308 of the Virginia Code. Thus, this argument must also be rejected, for it is apparent that Mr. Warner has met his burden under Rule 8(a) of the Federal Rules of Civil Procedure insofar as he has set forth a "short and plain statement" showing that he is entitled to relief under Section 65.2–308.

the plaintiff's demand for a jury trial on her 65.2–308 claim).

Section 65.2–308 provides that "[t]he court shall have jurisdiction, for cause shown, to restrain violations and order appropriate relief, including actual damages and attorney's fees to successful claimants and the rehiring or reinstatement of the employee, with back pay plus interest." However, as in *Valentine*, Mr. Warner demands only damages. Thus, because Mr. Warner has chosen only to seek actual damages and attorney fees for the defendants' alleged violation of Section 65.2–308, it appears to the Court at this point that the jury should determine whether he is entitled to such relief. *See Valentine*, 1997 WL 573412, at *3–*4; *see also Curtis*, 415 U.S. at 195, 94 S.Ct. 1005 (noting that "a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law").

## C. Count Four: Wrongful Discharge in Violation of Virginia Public Policy

Count Four of Mr. Warner's complaint alleges that the defendants discharged him in violation of several public policies of Virginia. Specifically, Mr. Warner contends that his discharge violated public policy as expressed in three Virginia criminal statutes: (1) Section 18.2–59 of the Virginia Code, which prohibits extortion; (2) Section 18.2–417 of the Virginia Code, which prohibits libel and slander; and (3) Section 18.2–499 of the Virginia Code, which prohibits conspiracy to injure another his trade, business, or profession. With regard to Section 18.2–59, Mr. Warner's complaint contends that the defendants violated Virginia public policy embodied in the statute because they discharged Mr. Warner "from employment following Mr. Warner's refusal to acquiesce to the defendants' demand that he produce a pecuniary benefit to them (by virtue of not making workers' compensation claims or disability claims, thereby causing a lower incidence rate and hence lower ... insurance premiums for Buck Creek.)" As to Section 18.2–417, Mr. Warner asserts in his complaint that the defendants violated Virginia public policy because they "knowingly and maliciously lied by proclaiming that they fired Mr. Warner because he is a thief, that he stole automobile parts from his employer, and that he therefore committed the crimes of embezzlement and larceny." Lastly, concerning Section 18.2–499, Mr. Warner alleges in his complaint that the defendants violated Virginia public policy because "Ms. Dickerson, motivated by her own personal dislike for Mr. Warner, and the other defendants conspired to fabricate a complete falsehood for Mr. Warner's discharge ... and then to publish this falsehood widely and maliciously with intention or reckless disregard for Mr. Warner's business reputation."

The defendants argue that, to the extent that Mr. Warner's wrongful discharge claim is based on the defendants' alleged retaliation for his pursuit of disability benefits, it is preempted by ERISA. Mr. Warner concedes this point. Nevertheless, Mr. Warner contends that his wrongful discharge claim should go forward because it is also based on conduct by the defendants that does not relate to his pursuit of benefits. The defendants appear to agree that Mr. Warner's wrongful discharge claim is not preempted by ERISA to the extent that it is based on alleged conduct not related to his pursuit of disability benefits, for the defendants go on to mount a substantive challenge to the remainder of Mr. Warner's wrongful discharge claim. Thus, the Court will proceed to examine the rest of Mr. Warner's wrongful discharge claim to determine whether he has stated a claim for which relief can be granted under Virginia law.

For the reasons that follow, the Court holds that the criminal statutes cited by Mr. Warner are not sufficient in this case to support his claim for wrongful discharge in violation of Virginia public policy.

In order to illustrate the deficiencies in Mr. Warner's complaint, it will be necessary to conduct a brief overview of current Virginia law governing wrongful discharge. Any analysis of a wrongful discharge claim must begin by noting that Virginia firmly adheres to the doctrine of employment at will, whereby either party to an employment relationship that is not for a fixed term "is ordinarily at liberty to terminate the contract at will, upon giving the other party reasonable notice." *Miller v. SEVAMP, Inc.*, 234 Va. 462, 465, 362 S.E.2d 915, 917 (1987). As long as reasonable notice is given, either party can terminate the employment contract "for any reason or for no reason." *Id.* However, Virginia's adherence to the doctrine of employment at will is not without limit, for the courts of the Commonwealth have carved out a " 'narrow exception' " to the at-will rule with regard to discharges that violate established Virginia public policy. *Id.* at 467–68, 362 S.E.2d at 918 (quoting *Bowman v. State Bank of Keysville*, 229 Va. 534, 540, 331 S.E.2d 797, 801 (1985)).

As a threshold matter, an employee plaintiff attempting to assert a wrongful discharge claim must "identify [a] Virginia statute establishing a public policy" that was violated by the employer. *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 94, 98–99, 465 S.E.2d 806, 809 (1996); *accord King v. Donnkenny, Inc.*, 84 F.Supp.2d 736, 740 (W.D.Va.2000) (stating that "the two exceptions to employment-at-will are that a plaintiff can maintain her suit where the termination results solely from her free exercise of a *statutory* right ... or where a plaintiff belongs to a class of individuals protected by the *public policy of a statute*, and the termination, in and of itself, violates the policy or statute" (emphasis added) (citations omitted)). However, even though "all statutes of the Commonwealth reflect public policy to some extent," the Virginia Supreme Court recently explained that "termination of an employee in violation of the public policy underlying any one of them does not automatically give rise to a common law cause of action for wrongful discharge." *City of Virginia Beach v. Harris*, 259 Va. 220, 232, 523 S.E.2d 239, 245 (2000). The Supreme Court clarified the law of wrongful discharge by explaining that the Court has found public policy sufficient to support a wrongful discharge claim in only two scenarios. First, a statute that contains an "explicit statement[ ] of public policy (e.g. 'It is the public policy of the Commonwealth of Virginia [that] ...')" will support a wrongful discharge action. *Id.* (citing *Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 105, 439 S.E.2d 328, 331 (1994) (quoting Va. Code. Ann. § 2.1–715)). Second, the Court explained that statutes "that do not expressly state a public policy, but were enacted to protect the property rights, personal freedoms, health, safety, or welfare of the general public, may support a wrongful discharge claim if they further an underlying, established public policy that is violated by the discharge from employment." *Mitchem v. Counts*, 259 Va. 179, 189, 523 S.E.2d 246, 251 (2000). However, the Court also stated that in order "to rely on such a statute in support of a common law action for wrongful termination, an employee must be a member of the class of persons that the specified public policy was designed to protect." *Id.; see also Dray v. New Market Poultry Prods., Inc.*, 258 Va. 187, 191–92, 518 S.E.2d 312, 314 (1999).

*Harris* and *Mitchem,* which were decided on the same day, both involved plain-

tiffs who sought to base wrongful discharge claims on unexpressed public policy underlying Virginia criminal statutes. In *Harris,* the Court held that a police officer who was fired after obtaining a warrant for obstruction of justice against his superior could not base his wrongful discharge claim on the Virginia criminal statute pertaining to obstruction of justice. *See Harris,* 259 Va. at 226, 233–34, 523 S.E.2d at 241, 246. In contrast, the Court in *Mitchem* held that an employee who was fired after refusing to perform sexual acts with her superior could base a wrongful discharge claim on Virginia criminal statutes forbidding fornication and lewd and lascivious cohabitation, stating that the employment-at-will doctrine should not "serve as a shield for employers who seek to force their employees, under the threat of discharge, to engage in criminal activity." *Mitchem,* 259 Va. at 184, 189–90, 523 S.E.2d at 249, 252. A recent decision from the United States District Court for the Eastern District of Virginia provides a good explanation of the differing, yet consistent, results produced by the Virginia Supreme Court in *Harris* and *Mitchem:*

> The plaintiff in *Harris* was not within the protective reach of the obstruction of justice statute because he was neither required by the statute to do what he did, nor was he a victim of any putative violation of it. Instead, he sought to invoke the obstruction of justice statute to justify an act the statute did not require, namely, obtaining an arrest warrant for his superior officer. By contrast, the *Mitchem* plaintiff was within the protective reach of both statutes cited there because she was arguably under a legal duty, imposed upon her by the statutes, to refrain from doing what her supervisor wanted her to do, namely, engage in fornication and lewd and lascivious conduct.

*Anderson v. ITT Indus. Corp.,* 92 F.Supp.2d 516, 522 (E.D.Va.2000). The *Anderson* Court goes on to provide a useful summary of current wrongful-discharge law in Virginia after the Supreme Court's most recent decisions by stating that a successful plaintiff in a wrongful discharge claim must be able to show "either (i) a statutorily-created right which the termination interferes with or violates, (*Bowman*) or (ii) a statutorily-imposed duty which the employee is terminated for refusing to violate (*Dray* and *Mitchem*)." *Id.; accord King,* 84 F.Supp.2d at 740.

In his complaint, Mr. Warner attempts to state a claim for wrongful discharge by pointing to Virginia criminal statutes forbidding extortion, defamation, and conspiracy to injure another in his business, and Mr. Warner points to *Mitchem* as authority for his assertion that the criminal statutes he cites are sufficient to establish Virginia public policy that was violated by his termination. Mr. Warner's position does have some basis in the language of the Virginia Supreme Court's wrongful discharge opinions. First, although the statutes cited by Mr. Warner do not expressly state a public policy, "like all criminal statutes, [they have] as an underlying policy the protection of the public's safety and welfare," thus causing them to fall into the second category of statutes which can form the basis of a wrongful discharge claim. *Harris,* 259 Va. 220, 523 S.E.2d 239. Second, as in *Mitchem,* the criminal statutes cited "were enacted for the protection of the general public, and [Mr. Warner] is a member of that class of persons whom these statutes were designed to protect." *Mitchem,* 259 Va. at 189, 523 S.E.2d at 252.

However, after analyzing *Mitchem* in the context of the rest of the case law involving wrongful discharge, the Court is of the opinion that the Virginia

Supreme Court would not extend its ruling in *Mitchem* to the facts alleged in Mr. Warner's complaint. *Cf. Leverton v. AlliedSignal, Inc.*, 991 F.Supp. 486, 493 (E.D.Va.1998) (noting that a federal court "must strive to forecast how the Supreme Court of Virginia would determine [the] issue and then follow that prescribed course"). The defendants contend that Mr. Warner's use of the criminal statutes at issue here is flawed because he uses them to show that the defendants engaged in illegal conduct, not to show that he engaged in protected activity for which he was fired. The defendants' point is well taken. A review of the major cases in which the Virginia Supreme Court has addressed the public policy exception to the at-will employment rule reveals that the plaintiffs in those cases all sought redress because they were fired for engaging in what they believed to be protected activity. *See, e.g. Harris,* 259 Va. at 226, 523 S.E.2d at 241 (police officer contended that the public policy behind Virginia criminal statutes was violated when he was fired for obtaining warrants against his superior for obstruction of justice and delay in executing lawful process); *Dray,* 258 Va. at 189–90, 518 S.E.2d at 313 (employee at a poultry plant alleged that the public policy behind the Virginia Meat and Poultry Products Inspection Act was violated when she was fired for informing inspectors of "unsanitary conditions and adulterated poultry products"); *Lawrence Chrysler,* 251 Va. at 96–98, 465 S.E.2d at 808–09 (body shop employee claimed that Virginia public policy was violated when he was fired because he refused to repair an automobile in a manner that he believed to be unsafe); *Bowman,* 229 Va. at 537–540, 331 S.E.2d at 799–801 (bank employees contended that Virginia public policy was violated when they were fired for exercising their statutory right as stockholders to vote at a stockholder meeting).[8] In *Mitchem,* the plaintiff alleged that she was fired for refusing to violate Virginia criminal laws forbidding fornication and lewd and lascivious cohabitation. *See* 259 Va. at 184, 523 S.E.2d at 249. As a result, *Mitchem* falls squarely into the typical wrongful discharge scenario in which the plaintiff alleges that she was discharged for engaging in activity protected by the public policy of Virginia (in Mitchem's case, the act of abstaining from criminal activity). Thus, because he does not allege that he was fired because he refused to engage in the criminal acts prohibited by the statutes he cites, Mr. Warner does not state a wrongful discharge claim based on *Mitchem. See id.* at 190–91, 523 S.E.2d at 252–53 (holding that the trial court correctly dismissed the plaintiff's wrongful discharge claim based on the public policy underlying the criminal assault and battery statute "because Mitchem did not allege that her employer discharged her for refusing to commit this crime"); *see also Brown v. Wal–Mart Stores, Inc.,* 52 Va. Cir. 480 (2000) (citing *Mitchem* in the course of agreeing "with the defendant's

8. One possible expansion of the typical wrongful discharge scenario was articulated in *Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 439 S.E.2d 328 (1994), where the Virginia Supreme Court recognized a wrongful discharge claim when employees were terminated on the basis of race and gender. *See id.* at 106, 439 S.E.2d at 332. Although the specific holding in *Lockhart* has since been superceded by statute, *see* Va.Code Ann. § 2.1–725(D), *Lockhart* arguably still stands for the principle that an employee states a viable wrongful discharge claim when her "termination, in and of itself, violates the policy or statute." *King,* 84 F.Supp.2d at 740 (citing *Lockhart* ). However, just as his claim does not fit into the typical wrongful discharge scenario described above, Mr. Warner also does not state a claim under *Lockhart,* for his termination did not violate the criminal statutes that he cites, nor did it violate the public policies behind those statutes.

argument that a criminal statute has been held to provide a public policy source for a *Bowman* claim only where an employer discharges an employee for refusing to perform a criminal act").

 To review, it is apparent that Mr. Warner's complaint fails to state a claim for wrongful discharge in violation of Virginia public policy under either of the current scenarios for recovery explained by the *Anderson* Court. Mr. Warner does not have a "statutorily-created right" which was violated by his termination. *Anderson*, 92 F.Supp.2d at 522. Furthermore, he has not alleged that he had "a statutorily-imposed duty" which he was terminated for refusing to violate. *Id.* Thus, Mr. Warner's complaint does not state a claim for which relief can be granted under current Virginia law. In order to find that Mr. Warner has stated a claim, the Court would have to expand Virginia's "narrow exception" to the at-will employment rule beyond the parameters established by the Virginia Supreme Court. As a result, the Court will grant the defendants' motion to dismiss Count Four of Mr. Warner's complaint.

### D. Count Eight: Intentional Infliction of Emotional Distress

Count Eight of Mr. Warner's Complaint attempts to state a claim for intentional infliction of emotional distress ("IIED") and incorporates by reference the factual allegations described earlier in this opinion. Mr. Warner asserts that the defendants' conduct "was intentional, and they knew or should have known that Mr. Warner would experience severe emotional distress as a result." Mr. Warner goes on to claim in Count Eight that the defendants' "conduct was outrageous, and it proximately and factually caused Mr. Warner's severe emotional distress." As with Count Four, the defendants argue that, to the extent that Mr. Warner's IIED claim is based on the defendants' alleged retaliation for his pursuit of disability benefits, it is preempted by ERISA. Mr. Warner concedes that an IIED claim based only on ERISA retaliation would be preempted, but he contends that his IIED claim is based on conduct separate from the acts alleged in support of the ERISA claim and thus should not be preempted. Again, the defendants appear to agree that Mr. Warner's IIED claim is not preempted by ERISA to the extent that it is based on alleged conduct not related to his pursuit of disability benefits, for the defendants go on to mount a substantive challenge to Mr. Warner's IIED claim. For the reasons that follow, the Court agrees with the defendants that Mr. Warner's IIED claim must be dismissed in any event for failure to state a claim upon which relief could be granted.

 Virginia courts recognize that "emotional distress resulting from a non-tactile tort may be compensated if the plaintiff alleges, and proves by clear and convincing evidence, that: [1] the wrongdoer's conduct is intentional or reckless; [2] the conduct is outrageous and intolerable; [3] the alleged wrongful conduct and emotional distress are causally connected; and, [4] the distress is severe." *Russo v. White*, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991) (*citing Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974)). In determining whether a plaintiff has stated a claim for emotional distress, the Court "must initially determine whether the facts alleged will support a finding of both outrageousness and severe emotional distress." *Id.* at 26–27, 400 S.E.2d at 162. In evaluating the "outrageousness" prong, the Court must determine whether the defendant's alleged conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 27, 400 S.E.2d at 162 (internal quotation marks omitted).

In attempting to state a claim for IIED in Count Eight, Mr. Warner relies upon the facts alleged earlier in his complaint. Upon review of the facts alleged by Mr. Warner, and after taking all of Mr. Warner's factual allegations as true and drawing all inferences therefrom in his favor, the Court finds that Mr. Warner has failed to allege facts sufficient to show that the defendants' conduct was outrageous for purposes of stating a claim for IIED under the law of Virginia. In his memorandum in opposition to the defendants' motion to dismiss, Mr. Warner rightly focuses on the allegations in his complaint concerning the defendants' allegedly false statements that he was fired for theft—statements that Mr. Warner contends were made with the intent to destroy his reputation in the community. While these allegations, if true, would show that the defendants engaged in unacceptable conduct and might support a finding of liability with regard to other claims set forth in his complaint,[9] Mr. Warner's allegations simply fail to show that the defendants engaged in conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* at 27, 400 S.E.2d at 162. Because the allegations in Mr. Warner's complaint are completely insufficient to demonstrate the level of outrageousness required under Virginia law, "it appears beyond doubt that [Mr. Warner] can prove no set of facts in support of his [IIED] claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. Therefore, the Court will grant the defendants' motion to dismiss Count Eight of Mr. Warner's complaint.

### E. Count Nine: Tortious Interference with Business Relations

 Count Nine of Mr. Warner's complaint alleges that defendant Kimberly Dickerson committed the tort of interference with business relations. According to the law of Virginia, the elements of tortious interference with a contract or business expectation are as follows:

"(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."

*Saliba v. Exxon Corp.,* 865 F.Supp. 306, 311 (W.D.Va.1994) (quoting *Chaves v. Johnson,* 230 Va. 112, 335 S.E.2d 97 (1985)), *aff'd,* 52 F.3d 322 (4th Cir. Apr. 21, 1995) (unpublished table decision). In addition, "when a contract is *terminable at will,* a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed *'improper* methods.'" *Duggin v. Adams,* 234 Va. 221, 226–27, 360 S.E.2d 832, 836 (1987) (quoting *Hechler Chevrolet, Inc. v. General Motors Corp.,* 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985)); *see also Saliba,* 865 F.Supp. at 312. The parties do not dispute that the contract between Mr. Warner and Buck Creek was terminable at will.

 The defendants' first argument in favor of dismissal of the tortious interference claim is that, because Mr. Warner has alleged no facts showing that Ms. Dickerson acted outside of the scope of her em-

---

9. For example, such allegations, if proved, might support his defamation claim.

ployment, she cannot be sued individually. However, this argument lacks merit in the face of the allegations set forth in Mr. Warner's complaint. Specifically, Mr. Warner alleges that he had a "valid contractual relationship with Buck Creek" and a business expectancy that his employment would continue as long as he performed his job in a satisfactory manner. Mr. Warner contends that Ms. Dickerson had actual knowledge of the contractual relationship and business expectancy and that, because of her "personal dislike" for him, intentionally interfered with Mr. Warner's relationship with Buck Creek by "inducing Buck Creek to terminate the relationship." Thus, the Court is of the opinion that the complaint is sufficient to place the defendant on notice that Mr. Warner is claiming that Ms. Dickerson tortiously interfered with his at-will employment contract with Buck Creek and that she acted outside the course of her employment in so doing.

■ The defendants' second argument for dismissal of the tortious interference claim is that the complaint fails to set forth facts showing that Ms. Dickerson's alleged interference was achieved by improper methods. This argument also must fail. Mr. Warner's complaint alleges that Ms. Dickerson acted "maliciously and fraudulently, committing the independent torts of fraud and defamation as well as sharp practices to achieve her ends." Fraud, defamation, and sharp practices are specific examples of "improper methods," as explained by the Virginia Supreme Court in *Duggin*. *See* 234 Va. at 227–28, 360 S.E.2d at 836–37. Furthermore, Count Nine incorporates the complaint's earlier factual allegations by reference, and in those paragraphs the complaint alleges that Ms. Dickerson fabricated the charges of theft against Mr. Warner. Thus, because it is not apparent from his complaint that Mr. Warner would not be entitled to relief for his tortious interference claim, the Court will deny the defendants' motion to dismiss Count Nine of Mr. Warner's complaint.

*F. Count Ten: Conspiracy to Injure Reputation and Business Reputation*

■ Lastly, in Count Ten of his complaint, Mr. Warner alleges that the defendants "willfully and maliciously combined, associated, mutually undertook, and conspired for the purpose of injuring [his] reputation and business reputation." Mr. Warner's complaint further alleges that the defendants' actions caused him "severe damages to his reputation and his business reputation, his ability to earn a livelihood either by employment or by starting his own business in the local area around his home." Under the Virginia Code,

[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class I misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2–500.

Va.Code Ann. § 18.2–499. In order to recover for such a conspiracy, a plaintiff must be able to prove " '(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff.' " *Saliba*, 865 F.Supp. at 313 (quoting *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984)). The defendants have set forth several different reasons why the allegations in Mr. Warner's complaint fail to state a cause of action under Sections 18.2–499 and 18.2–500.

The defendants argue that the conspiracy claim must fail because a corporate employer cannot conspire with its employees acting within the scope of their employment, and Mr. Warner's complaint does not allege any facts to show that Mr. West and Ms. Dickerson were not acting within the scope of their employment with Buck Creek. While it is true that a corporation cannot conspire under Section 18.2–499 with its agents acting within the scope of their employment, *see Fox v. Deese*, 234 Va. 412, 428, 362 S.E.2d 699, 708 (1987), as explained above with regard to Count Nine, Mr. Warner's complaint sufficiently alleges that Ms. Dickerson was acting outside the scope of her employment.[10] The defendants correctly point out, however, that, to the extent Mr. Warner has based his conspiracy claim on injury to his personal reputation or employment (as opposed to business) interests, he has failed to state a claim under Sections 18.2–499 and 18.2–500. *See Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir.1985) (noting that employment interests are excluded from the scope of Sections 18.2–499 and 18.2–500); *Jordan v. Hudson*, 690 F.Supp. 502, 507–08 (E.D.Va.1988) (same), *aff'd*, 879 F.2d 98 (4th Cir.1989). Undaunted, Mr. Warner attempts to distinguish his case by pointing out that he is attempting to redress damage done to his future employment, not to redress a past discharge. However, given the broad language employed by the Fourth Circuit and the district courts with regard to the exclusion of employment interests from the scope of Section 18.2–499, Mr. Warner's argument is not well taken.

Similarly, the Court does not agree with Mr. Warner's contention that he states a claim under the statutes on account of his allegations that the defendants conspired to injure his ability in the future to start his own business in the area. In order to state a claim under Section 18.2–499, courts have held that the conspiracy must be one to injure the plaintiff "in his business." *See, e.g., Saliba*, 865 F.Supp. at 313 (quoting *Allen Realty*, 227 Va. at 449, 318 S.E.2d at 596); *see also Campbell v. Board of Supervisors of Charlotte County*, 553 F.Supp. 644, 645 (E.D.Va.1982) (noting that Section 18.2–499 "is aimed at conduct which injures a 'business'"); *Moore v. Allied Chem. Corp.*, 480 F.Supp. 364, 374 (E.D.Va.1979) ("The statute does not restrict its coverage to corporations; by speaking of injury to 'another in his reputation, trade, business or profession,' Section 18.2–499 also protects individuals who own and operate a business."). While the Court is not aware of any published opinions specifically addressing the issue of whether the statute applies to injury to an unspecified future business, in an unpublished decision, the United States District Court for the Eastern District of Virginia dismissed a plaintiff's claim under Section 18.2–500 because she "did not have a business at the time of the [alleged conduct by the defendants]." *Noakes v. Ford*, 1996 U.S. Dist. LEXIS 19352, at *14–*15 (E.D.Va. Oct. 18, 1996) (noting that Section 18.2–500 "does not address future businesses, unforeseen at the time of the alleged wrong").[11] In light

---

**10.** The defendants also argue that Count Ten must be dismissed because Mr. Warner has not alleged any facts demonstrating any combination, association, mutual undertaking, or conspiracy among or between the defendants. However, the Court is of the opinion that the allegations alleged in Mr. Warner's complaint supply notice of the basis of his claim suffi-

cient to satisfy Rule 8(a) of the Federal Rules of Civil Procedure.

**11.** The Court is aware that in *Noakes* the pro se plaintiff's complaint was dismissed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See Noakes*, 1996 U.S. Dist. LEXIS 19352, at *1. The

of the language of the opinions of the Virginia and federal courts described above, the Court is of the opinion that the *Noakes* Court correctly refused to apply Section 18.2–500 to a claim of injury to an unspecified future business endeavor. Thus, for all of the foregoing reasons, the Court will grant the defendants' motion to dismiss Count Ten of Mr. Warner's complaint.

## IV. CONCLUSION

For the reasons stated above, the defendants' motion to dismiss Counts Two, Three, Four, Eight, Nine, and Ten of Mr. Warner's complaint for failure to state a claim will be granted in part and denied in part.

## ORDER

This matter is currently before the Court on the defendants' motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Counts Two, Three, Four, Eight, Nine, and Ten of the plaintiff's complaint. For the reasons stated in the attached Opinion, the defendants' motion to dismiss shall be, and hereby is, GRANTED in part and DENIED in part. Specifically,

(1) the defendants' motion to dismiss Count Two of the plaintiff's complaint shall be, and hereby is, DENIED;

(2) the defendants' motion to dismiss Count Three of the plaintiff's complaint shall be, and hereby is, DENIED;

(3) the defendants' motion to dismiss Count Four of the plaintiff's complaint shall be, and hereby is, GRANTED;

(4) the defendants' motion to dismiss Count Eight of the plaintiff's complaint shall be, and hereby is, GRANTED;

(5) the defendants' motion to dismiss Count Nine of the plaintiff's complaint shall be, and hereby is, DENIED; and

(6) the defendants' motion to dismiss Count Ten of the plaintiff's complaint shall be, and hereby is, GRANTED.

It is so ORDERED.

Court is also aware that in affirming the district court's decision, the Fourth Circuit modified the dismissal to fall only under Rule 12(b)(1). *See Noakes v. Ford,* 139 F.3d 891, 1998 WL 168366, at *1 (4th Cir. Mar.31, 1998) (unpublished table decision). However, it does not appear to the Court that the Fourth Circuit's decision to modify the dismissal of Ms. Noakes's complaint was due to a disagreement with the district court's reasoning on the Section 18.2–500 issue. *See id.* at *1 ("We have reviewed the record and the district court's opinion and find no reversible error.").